No. 56,933

STATE OF KANSAS, *Appellant,* v. RENE E. EPPERSON and MICHAEL J. AUERBACH, *Appellees.*

(703 P.2d 761)

Opinion filed July 26, 1985.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the briefs for appellant.

*Daniel E. Monnat,* of Fisher & Monnat, of Wichita, argued the cause, and *Stanley Spurrier, III,* of the same firm, was with him on the brief for appellee Rene E. Epperson.

*Jack Focht,* of Focht, Hughey & Hund, of Wichita, was on the brief for appellee Michael J. Auerbach.

The opinion of the court was delivered by

MILLER, J.: This is an interlocutory appeal by the State in a criminal case from the order of the trial court suppressing evidence. The Court of Appeals, in a *per curiam* unpublished opinion, affirmed the trial court's decision under Rule 7.042 (b), (d) and (e) (235 Kan. lxxiv). We granted the State's petition for review.

The relevant facts are not in dispute. On Sunday, June 19, 1983, shortly after 2:00 o'clock a.m., Officer Harrison of the Wichita police was on routine patrol. He was driving a marked police vehicle and he was in uniform. There was a problem with burglaries in this particular area, and the officer drove down an alley, checking the rear entrances of various business establishments for signs of forcible entry. He noticed nothing unusual. As he emerged on Mt. Carmel Street, he saw a black BMW, an expensive automobile, legally parked, facing the north. He saw that the car was occupied by two men, later identified as the defendants Epperson and Auerbach. When the occupants saw the patrol car, they appeared startled and the passenger made a quick reach to the floorboard area and then straightened back up. The officer pulled out of the alley as quickly as possible and parked in the middle of the street near the BMW. The occupants had emerged from their car and were just starting to walk away.

The officer left his car very quickly and, in order to detain the men who appeared to be leaving, the officer said, "Excuse me," or "Sir," or "Wait," or "Wait a minute," and the men stopped. Both were still within three feet of the BMW, one on each side. The officer asked them if they lived in the area and they said no. He asked them what they were doing and the driver responded, "We were just leaving." Officer Harrison told them that their response did not answer the question and he again asked them what they were doing there. He got no answer from them, only a shrug.

There were only two businesses in the area open at that time of the night, a car wash and a private club. The BMW was parked about a hundred and fifty yards from the private club and not near any residence. Mt. Carmel Street was deserted; there were no cars of club patrons parked nearby and there was no traffic on the street. The officer noted that the window on the driver's side of the BMW was rolled down and, without entering the car, shined his flashlight inside. He observed an axe handle sticking

out from under the driver's seat. He opened the unlocked door, retrieved the axe handle and asked the driver what it was for. The driver replied that he carried it for protection. At this time the officer did not frisk or arrest either of the men. He shined his flashlight under the driver's seat and saw nothing unusual. He then leaned in and shined his flashlight on the floorboard under the passenger seat, and he saw two clear plastic "ziplock" baggies under that seat. He examined the baggies and determined that they probably contained cocaine. He then placed the two men under arrest, handcuffed them, patted them down and read them their *Miranda* rights. He asked the driver, Auerbach, whose cocaine it was, and Auerbach responded, "It's not mine." Backup officers soon arrived and both Auerbach and the passenger, Epperson, were taken to headquarters, where they were searched and more evidence was seized. Officer Harrison testified on cross-examination that up until the point in time when he examined the envelopes and placed the defendants under arrest, he did not have any cause to believe that they were committing or had committed any crime.

Both men were bound over for trial at a preliminary examination. Sometime thereafter, they filed motions to suppress. A lengthy hearing was held and at the close of the evidence, the trial judge found that a seizure of the defendants occurred before the arrest was made. He found that the officer did not have a reasonable or articulable suspicion of criminal activity to justify an investigative stop. He held further that the initial seizure of the defendants, the search of the car, and the seizure of the cocaine was unlawful. The court then suppressed the evidence as to both defendants. The decision was primarily based on a finding that the officer's initial stop of the defendants constituted a seizure of their persons and was unlawful.

The Court of Appeals affirmed on the grounds that the findings of fact of the trial court were substantiated by competent evidence, that the findings of fact and conclusions of law of the trial court adequately explained the decision, and that the trial court did not abuse its discretion.

It will be helpful if we first review some of the rules applicable in stop and identify or stop and frisk situations. Our stop and frisk statute is K.S.A. 22-2402, which reads:

"**22-2402. Stopping of suspect.** (1) Without making an arrest, a law enforcement

officer may stop any person in a public place *whom he reasonably suspects is committing, has committed or is about to commit a crime* and may demand of him his name, address and an explanation of his actions.

"(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that his personal safety requires it, he may search such person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person." (Emphasis supplied.)

We first discussed this statute in *State v. Jackson,* 213 Kan. 219, 515 P.2d 1108 (1973). We said:

"[E]ven though 'stop and frisk' has now been codified in 22-2402, police conduct in a 'stop and frisk' situation must be judged under the reasonable searches and seizures clause of the Fourth Amendment to the Constitution of the United States and the judicial interpretations thereof. This point was made by the United States Supreme Court in *Sibron v. New York,* 392 U.S. 40, 20 L.Ed.2d 917, 88 S.Ct. 1889 [1968], in considering the reasonableness of searches and seizures under The Consolidated Laws of New York Annotated, Code of Criminal Procedure, § 180-a (now § 140-50, effective September 1, 1971). The New York statute was followed in the drafting of 22-2402. (See Judicial Council Comment appended to K.S.A. 1972 Supp. 22-2402.)

"The position of the state in this appeal is put in focus by the succinct statement of the issue by the district attorney in his brief:

" 'The issue in this appeal, as was the issue in *Terry v. Ohio,* [392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968)], is whether in all the circumstances of the on-the-street encounter, the appellee's personal security was violated by an unreasonable search and seizure. . . .'

"We agree the issue here is the same as that in *Terry v. Ohio,* supra. However, we do not find controllable similarity in the facts of the two cases. In *Terry* the arresting officer observed the actions of Terry and codefendant Chilton for a period of more than ten to twelve minutes. Terry and Chilton were each seen strolling by a store and peering in the window five or six times. They would join each other and a third man after these sidewalk strolls. The officer testified that after observing the elaborately casual and oft-repeated reconnaissance of the store window, he suspected the men of 'casing a job, a stick-up.' He considered it his duty as a police officer to investigate further and added that he feared 'they might have a gun.' The officer approached the three, identified himself and asked for their names. When the men 'mumbled' something in response, Terry was seized and a 'pat down' search of the three disclosed guns on Terry and Chilton. The search and seizure was held to be reasonable. In the instant case defendant was stopped when first observed by O'Dell who gave as his only reason 'it was a common practice to check out persons on the roadway this time of night.' No suspicious actions on the part of defendant were observed, nor was anything about defendant's appearance described as suspicious except that he was walking on the highway late at night, and if this fact alone aroused deputy sheriff O'Dell's suspicion he did not testify to that effect. O'Dell described no suspi-

cious mannerisms or unusual nervousness on the part of defendant which would alarm a prudent official.

. . . .

"[T]he 'stop' authorized by 22-2402 requires that a *law enforcement officer must have prior knowledge of facts or observe conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime.* Further, in order to justify the search for weapons authorized under the provisions of subsection (2) of 22-2402, the officer must have prior knowledge of facts or observe conduct of the person or receive responses to the limited interrogation authorized by subsection (1) which, in the light of his experience, would cause the officer to reasonably suspect that his personal safety requires such search.

"It should be kept in mind, of course, that the reasonable suspicion on the part of an officer required by 22-2402 does not rise to the level of probable cause required by the preceding section K.S.A. 1972 Supp. 22-2401, which deals with the making of an arrest.

"The reasonableness of a search is, in the first instance, a substantial determination to be made by the trial court from the facts and circumstances of the case. (*Ker v. California*, 374 U.S. 23, 10 L.Ed.2d 726, 83 S.Ct. 1623.)" 213 Kan. at 222-23, 225. (Emphasis supplied.)

*Jackson* was followed a year later by our opinion in *City of Garden City v. Mesa*, 215 Kan. 674, 527 P.2d 1036 (1974). There, the Garden City police seized the defendant as he stood in the doorway of a well-lighted business at 4:00 o'clock in the morning. The defendant told the officers that he was doing some work in the shop, but he refused to provide further identification. When defendant attempted to push one of the officers aside, he was arrested and charged with resisting a police officer in the discharge of his duties. We affirmed his conviction, holding that the officers were acting reasonably and with justification in approaching defendant and requesting his identity. Justice Prager dissented, contending that the observations of the officers and the facts known to them fall far short of the standards set by *Jackson; Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968); *Sibron v. New York*, 392 U.S. 40, 20 L.Ed.2d 917, 88 S.Ct. 1889 (1968); and *Adams v. Williams*, 407 U.S. 143, 32 L.Ed.2d 612, 92 S.Ct. 1921 (1972).

An important later case is that of *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979). There, the officer approached a parked car in which defendant was seated, and asked defendant's name and identification. We held that the officer's request constituted a proper police activity and did not constitute a "stop and frisk" which, we said, "requires a 'reasonable suspicion' that a crime

has been committed." The officer did not stop or detain the car in which Marks was seated, and did not stop or detain his person. The opinion, however, contains the following discussion:

"In *Brown v. Texas*, 443 U.S. 47, 61 L.Ed.2d 357, 99 S.Ct. 2637 (1979), a defendant was convicted under a Texas statute making it a crime for a person to intentionally refuse to report his name and address to a police officer, who has lawfully stopped the person and requested such information. The defendant [who was seen walking in an El Paso alley about noon] was asked by a police officer for identification which he refused to provide. He was then arrested, charged, and convicted of a violation of the Texas statute. The United States Supreme Court held that the defendant's conviction under the Texas statute should be set aside, since the stopping of the defendant by the police and requiring him to identify himself violated the Fourth Amendment. The court reasoned that since the officer admittedly stopped the defendant purely to obtain his identification and had no reason to suspect that the defendant was engaged in criminal conduct, the stopping was an unreasonable seizure of his person. *Brown* makes it clear that when a police officer, without arresting an individual, stops and restrains him for the purpose of having him identify himself, that constitutes a seizure of his person subject to the Fourth Amendment. It is stated in the opinion that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be reasonable. *United States v. Brignoni-Ponce*, 422 U.S. 873, 45 L.Ed.2d 607, 95 S.Ct. 2574 (1975). . . .

"For purposes of the Fourth Amendment, the reasonableness of a seizure of a person that is less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed.2d 824, 99 S.Ct. 2248 (1979); *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968)." 226 Kan. at 708-709.

In summary, a "stop and frisk," under *Terry* and our statute, requires that the officer have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime.

Whenever a police officer accosts a person and restrains his freedom, he has "seized" that person. The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 45 L.Ed.2d 607, 95 S.Ct. 2574 (1975). This requires an officer to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity. *Brown v. Texas*, 443 U.S. 47, 50, 61 L.Ed.2d 357, 99 S.Ct. 2637 (1979); and see also *United States v. Hensley*, 469 U.S. _____, 83 L.Ed.2d 604, 105 S.Ct. 675 (1985).

The first issue in the case before us is whether Officer Harri-

son had a reasonable suspicion that the defendants had engaged, were engaging, or were about to engage in criminal activity at the time he first confronted them. The trial court found that he did not then have a reasonable or articulable suspicion of criminal activity. The officer had no knowledge of any prior crime; he had not seen or heard of any nearby break-in or other offense and had no reason to suspect these defendants of any such crime. He did not see them commit any offense. Their car was lawfully parked in an area where cars of customers of the private club frequently parked, although there were closer parking spaces available. They did not appear to be armed. The officer was suspicious but he had no objective facts upon which to form a belief that the men were involved in criminal activity. That the men appeared startled when the patrol car emerged from the alley, that the passenger appeared to reach down to the floorboard area, and that the men got out of the car and started to walk away, is not indicative of criminal activity. The officer was looking for burglary suspects. The defendants, well-dressed occupants of an expensive car, did not appear to be burglars. The officer was not looking for drug users or dealers, or at least he did not testify that he was. The defendants gave him no reason to suspect that they were users, possessors or dealers. The trial court's finding that the officer's initial "stop" of the defendants was not based upon a reasonable or articulable suspicion of criminal activity, based on fact, is correct.

The officer, however, had the right to direct questions to the men, and his questioning of them does not violate any statute or constitutional principle. Certainly a police officer, in making an investigation, may ask questions of people who are upon the public streets. The real issue is, then, did the officer make an unlawful and unauthorized stop of the defendants which constituted a seizure of them under *Brown v. Texas*?

The officer testified on direct examination that as he approached the defendants he said, "Excuse me," or "Sir," or "something to that effect" to get their attention. On cross-examination, he testified that he did not say "Stop," or "Halt," but admitted that he could have said, "Wait," or "Wait a minute," or words to that effect. He did not touch either defendant; he did not tell them not to move or not to leave; he simply hailed them and asked two or three questions, and the men immediately

stopped. The officer did not want the men to leave; he wanted them to remain there while he checked them out. He parked his patrol car in such a manner that his open car door blocked the lane of travel in which the BMW was parked. The trial court found that he "cut off their avenue of escape" by leaving his car door open. Under the facts as disclosed in this record, we conclude that the officer stopped the defendants. The evidence permits no other finding. Since he had no basis in fact for reasonably suspecting that the defendants were involved in criminal activity, the stop amounted to a seizure of the defendants and was unlawful under *Brown, Terry* and K.S.A. 22-2402(1).

We turn now to the question of the legality of the search of the vehicle. It was parked on a public street. The officer—standing in the public street—could look inside the car and he could shine a flashlight inside the car. He was entitled to be in the public street and he could observe what was in plain view. We find no fault with his discovery and removal of the axe handle. Certainly if there had been an axe on the hidden end, it could have constituted a burglary tool. The trial court specifically found that the axe handle was not a burglary tool or an improper item to have in the car. The car was unlocked, and the officer opened the door, reached inside the car, and removed the axe handle. When told by the driver that he carried it for protection, however, the officer returned the handle to the car. The State argues that possession of the axe handle was a violation of a Wichita ordinance, but the defendant was never charged with such a crime and the ordinance is not provided for our consideration. There is nothing in the record to indicate that the officer was aware of the ordinance, or that he considered possession of the handle an offense. We will consider that argument no further. So far as the officer was concerned, he was finished with the axe handle.

Next, he entered the car a second time and searched the area under the seats. At no time did he testify that he could see the plastic baggies until he entered the car and shined his light under the seats. As he stood outside, even with the aid of his flashlight, he could not see the baggies. Was this search of the vehicle, under these circumstances, unlawful? We conclude that it was.

As a *Terry* search, the vehicle search was clearly unauthorized.

The only justification of a *Terry* search is the protection of police officers and others nearby. The preservation of evidence is not one of the purposes of such a search. See *Michigan v. Long*, 463 U.S. 1032, 1049, 77 L.Ed.2d 1201, 103 S.Ct. 3469 (1983). Here, the defendants were outside the car; any weapons concealed inside the car were beyond their reach. The officer called in on his radio that he was checking out two individuals, but he did not need a backup. He did not suspect that defendants were armed and was not concerned for his own immediate safety. He did not search the defendants or "pat them down" for weapons. We conclude that the officer did not need to search the car for his own protection.

The State suggests that the search was justified as an incident to a lawful arrest. The difficulty with that argument is that a lawful arrest must come first, followed by a search, and the arrest must be based on probable cause or a warrant to be lawful. Here, the officer first conducted the search and then arrested the defendants as a result of the items found in the search. The argument that an officer may conduct any search he wishes and, if he finds contraband, justify the search on the basis that it was incident to the later resulting arrest, is hardly persuasive. The search incident to a lawful arrest exception is codified in K.S.A. 22-2501. That statute does not apply to the facts of this case. The search of the area under the seats was not justified as an incident to the arrests which followed.

The State also contends that the search upon which the baggies were discovered was justified under the plain view doctrine. We set forth the requirements for the plain view exception in *State v. Galloway*, 232 Kan. 87, 93-94, 652 P.2d 673 (1982):

"[T]he plain view exception to the 4th Amendment of the United States Constitution and Section 15 of the Bill of Rights of the Kansas Constitution is applicable only where it is shown: 1) The initial intrusion which afforded the authorities the plain view was lawful by virtue of a warrant (search or arrest), waiver or exigent circumstances; 2) the discovery of the evidence was inadvertent; and 3) the authorities immediately had reasonable or probable cause to believe the evidence observed in plain view was incriminating in nature."

Applying the first requirement to the facts of this case, the officer was not lawfully within the car when he entered the second time to make a search of that vehicle. The baggies could not be seen from the street. The officer had no warrant, no waiver

to search, and there existed no exigent circumstances. The search was therefore not justified under the plain view doctrine.

Next, does Epperson, the former passenger, have standing to challenge the legality of the search of Auerbach's car? The State contends that he does not. In *State v. Worrell*, 233 Kan. 968, Syl. ¶ 1, 666 P.2d 703 (1983), we said:

"An illegal search can only violate the rights of those who have a legitimate expectation of privacy in the invaded place. The basic test to determine whether or not a person present on the premises at the time of the search has standing to challenge the validity of the search is not whether that person had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched."

Thus the question is, did Epperson have an expectation of privacy in the floorboard area under the passenger seat of Auerbach's car, which was parked, unlocked, with at least one window open, on a public street in Wichita? In the case of *State v. Heath*, 222 Kan. 50, 563 P.2d 418 (1977), the search of an automobile was challenged by the defendant who was a passenger in the car at the time it was searched. The driver had given his consent to the search. Heath claimed no interest in the automobile, which was owned by a third party, Brenda Boldredge, and no interest in the items seized. We held that Heath had no standing to challenge the search, saying:

"One who is neither an owner nor in possession of an automobile has no standing to challenge a search of the automobile. In *State v. Boster*, 217 Kan. 618, 539 P.2d 294, this court stated:

" 'On numerous occasions we have applied this principle to the search of an automobile and held that one who is neither an owner nor in possession of an automobile lacks standing to invoke the constitutional guarantee of immunity from unreasonable search and seizure. (*State v. Edwards*, 197 Kan. 146, 415 P.2d 231; *State v. Roberts*, 210 Kan. 786, 504 P.2d 242.) . . .

" 'Similarly, we denied a motion to suppress for lack of standing in *Roberts*, where the defendant was only a passenger in the car that was searched and he claimed no ownership or interest in it.' (p. 621.)" 222 Kan. at 51-52.

That, however, does not fully dispose of the issue here. In *State v. Boster*, 217 Kan. 618, 539 P.2d 294 (1975), quoted in *Heath*, we also said:

"We have held that one who seeks to challenge the legality of a search as a basis for suppressing relevant evidence must first allege, and if disputed he must establish, that he was the victim of the invasion of privacy. To establish a sufficient interest, a movant must claim either to have a proprietary or possessory interest in the premises searched, *or to have owned or possessed the seized property.* (*State v. Sumner*, 210 Kan. 802, 504 P.2d 239; *Jones v. United States*,

362 U.S. 257, 4 L.Ed.2d 697, 80 S.Ct. 725; *Brown v. United States,* 411 U.S. 223, 36 L.Ed.2d 208, 93 S.Ct. 1565; *Head and Cummings v. State,* 246 Miss. 203, 136 So. 2d 619.)

"On numerous occasions we have applied this principle to the search of an automobile and held that one who is neither an owner nor in possession of an automobile lacks standing to invoke the constitutional guarantee of immunity from unreasonable search and seizure. (*State v. Edwards,* 197 Kan. 146, 415 P.2d 231; *State v. Roberts,* 210 Kan. 786, 504 P.2d 242.) In *Edwards,* the automobile searched was not owned by the defendant, nor was it in his possession or control. The defendant therein did not claim any interest in the car *or in the property taken therefrom.* Consequently, we held the defendant lacked standing to protest the search.

"Similarly, we denied a motion to suppress for lack of standing in *Roberts,* where the defendant was only a passenger in the car that was searched and he claimed no ownership or interest in it." 217 Kan. at 621. (Emphasis supplied.)

Counsel for Epperson told the court that his client was prepared to testify that he had a possessory interest in the cocaine, and that the cocaine was his. However, he did not testify, and there is no evidence in the record that the cocaine was his. The proponent of a motion to suppress evidence has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search and seizure. See *Rakas v. Illinois,* 439 U.S. 128, 58 L.Ed.2d 387, 99 S.Ct. 421 (1978), *reh. denied* 439 U.S. 1122 (1979), and *Simmons v. United States,* 390 U.S. 377, 389-90, 19 L.Ed.2d 1247, 88 S.Ct. 967 (1968). Epperson, as moving party, failed to carry that burden, failed to show that he had an expectation of privacy in the area searched, and failed to show that the narcotics seized belonged to him. The rights of Auerbach, the owner, were violated by the search of his car, and the evidence seized was properly suppressed as to him. But is it admissible as against Epperson?

Epperson argues that because he was stopped and seized illegally, the evidence seized during the search of the car should be suppressed as fruit of the poisonous tree. We have held, and the rule is generally, that a passenger has no standing to challenge the search of a car which does not belong to him. Here, however, the initial stop and seizure of both Epperson and Auerbach was illegal, and we have so held. The search of the car followed quickly upon the heels of that illegal seizure. It would not seem logical to permit the evidence to be used as against the former passenger and not as against the former driver. Many cases have held that a passenger has standing to challenge a

search of a motor vehicle, where the motor vehicle and its passengers were improperly stopped. See, for example, *United States v. Santia-Manriquez*, 603 F.2d 575 (5th Cir. 1979); *State v. Hocker*, 113 Ariz. 450, 556 P.2d 784 (1976); *People v. Kunath*, 99 Ill. App. 3d 201, 425 N.E.2d 486 (1981); and *State v. Scott*, 59 Or. App. 220, 650 P.2d 985 (1982), *appeal after remand* 68 Or. App. 386, 681 P.2d 1188 (1984).

Here, without reasonable or articulable suspicion of criminal activity, the officer decided to stop the defendants, to search the car in which they had been riding, and ultimately to search the individuals. The stop was clearly in violation of our statute and the Fourth Amendment. Auerbach has the right to challenge the search as owner of the car. Epperson's right to challenge the search stems not from the fact that he was previously a passenger in the motor vehicle, but because he is a person who was unlawfully stopped and seized, and because the search followed as a consequence thereof. We conclude that the trial court was correct in suppressing the evidence as to both defendants.

The final matter for our consideration is the trial court's suppression order. Orally, the judge said: "I'm going to find that as to both parties in this case the evidence that has been . . . extracted from these defendants should be suppressed." The written order suppresses "the evidence seized herein from the vehicle of Michael J. Auerbach" and declares that it may not be used against either defendant.

The State contends that the court suppressed only the physical evidence taken from the car, not the statements later made by the defendants and the items taken from their persons. This construction of the court's announcement of his order from the bench seems strained. The motion sought suppression of physical evidence and "all statements and/or admissions" made during or after detention, arrest and search. The record nowhere indicates that the court intended to grant the motion in part and deny it in part. When discussing Epperson's standing, the court made reference to physical evidence taken from his person at the police station. A fair reading of the court's pronouncement indicates that because of the unlawful stop, the court was suppressing all evidence extracted from either defendant. This would include statements or admissions.

It is clear that all evidence extracted from the persons of the

defendants—both tangible and intangible—followed the unlawful stop. It was properly suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407 (1963).

The trial court's order suppressing the evidence as to both defendants is affirmed, as is the judgment of the Court of Appeals.

SCHROEDER, C.J., and McFARLAND, J., dissenting.