(184 P.3d 978)
No. 97,444

STATE OF KANSAS, *Appellee,* v. VANESSA GROSS, *Appellant.*

—

Opinion filed June 6, 2008.

*Andrew Parmenter,* legal intern, Washburn University School of Law, and *Randall L. Hodgkinson,* of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney,* assistant district attorney, *Nola Tedesco Foulston,* district attorney, and *Paul J. Morrison,* attorney general, for appellee.

Before HILL, P.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: After being convicted at a bench trial of one count of possession of cocaine in violation of K.S.A. 2004 Supp. 65-4160(a), Vanessa Gross appeals from the trial court's denial of her motion to suppress evidence. On appeal, Gross argues that the trial court erred in finding that there was reasonable suspicion to support her detention. We agree. Although the State contends that

the officers' encounter with Gross was a voluntary encounter, the totality of the circumstances in this case established that the officers made such a show of authority that a reasonable person in Gross' position would not have felt free to disregard the officers and terminate the encounter. As a result, the officers' encounter with Gross was an investigatory detention. Because the officers in this case did not have a particularized and objective basis for suspecting Gross of criminal activity, the detention was not supported by reasonable suspicion and was unlawful. As a result, the evidence obtained during the course of the unlawful detention and the resulting search of Gross must be suppressed as fruit of the poisonous tree.

Finally, Gross argues that she was unlawfully subjected to a body cavity search. Nevertheless, because we have ordered suppression of the evidence that was obtained during the search of Gross, this issue is moot. Accordingly, we reverse and remand for a new trial without the evidence obtained during the unlawful detention, including the evidence seized in the search of the car and the evidence obtained during the search of Gross.

One afternoon in March 2005, Officers Christopher Mains and Patrick Boucard were on patrol in a marked police car in Wichita when Boucard saw a parked car with the driver outside of the car. Boucard noticed that upon seeing the police car, the driver "snapped his neck back" once, quickly got into his car, and started driving. Mains, who was driving the patrol car, made a u-turn and followed the car. The car traveled a short distance and then abruptly parked. The driver, later identified as Ivan Stroot, got out of the car and started walking towards a house. Mains estimated that the car was parked approximately 4 to 5 feet from a driveway. Mains testified that parking within 8 feet of a driveway was a parking violation.

Mains pulled the patrol car parallel to the parked car. Boucard, who was seated in the passenger seat of the patrol car with his window rolled down, called out to Stroot. This initial contact occurred around 4:45 p.m. Noticing that the parked car had a Missouri license plate, Boucard asked Stroot if he was from Kansas City. Stroot replied that he was not from Kansas City. Boucard told

Stroot that his car was illegally parked too close to a driveway. Boucard asked Stroot what he was doing there. Stroot looked around and stated that he was going to a friend's house. Stroot pointed to a house near where he was parked. Boucard asked for the friend's name. Stroot said that he did not know. While talking with Stroot, Boucard noticed that Stroot kept looking towards his car. Although Stroot's car had tinted windows, Boucard saw movement within it and knew that there was a passenger inside the car.

Boucard testified that he believed Stroot was being untruthful and that Stroot was trying to distance himself from his car because there was something illegal in it. Boucard got out of the car and ordered Stroot to the back of the patrol car. According to Boucard, both Stroot and the passenger were detained at that point and were not free to leave. Boucard questioned Stroot about where he was going, whether he had ever been arrested, his drug history, and the passenger in his car. When Stroot said that his girlfriend was in the car, Boucard asked Stroot how long he had been with his girlfriend and whether they had a sexual relationship. According to Boucard, Stroot was very nervous and "was stuttering and hesitating on why he was there," during their conversation. Boucard accused Stroot of lying, but Stroot initially denied that he was lying.

While Boucard was talking with Stroot at the back of the patrol car, Mains walked over to Stroot's car and spoke with the passenger. Mains indicated that either the window was down or the door was open. During cross-examination, however, Mains acknowledged that he had Gross roll down the window or open the door. The passenger, who was still seated in the car, identified herself as Gross. When Mains began asking questions, Gross was initially reluctant to answer. Nevertheless, Gross eventually responded to Mains' questions. Mains asked Gross what they were doing there. Gross stated that she was there to visit her friend. Gross could not tell Mains the name of the friend she was visiting.

At some point during Boucard's questioning of Stroot, Stroot admitted that he was lying about visiting a friend. Boucard indicated that while Mains was talking to Gross Stroot admitted that he was lying. Mains testified that he walked over to Boucard and Stroot and told Stroot that his and Gross' stories did not match.

Stroot admitted to Boucard that he was not there to see anyone. Stroot stated that he was lying because he was nervous. Sometime during his conversation with Boucard, Stroot also admitted that he had been arrested for "narcotics," that he had recently gotten out of jail, and that he was still using marijuana.

Boucard walked over to the passenger side of Stroot's car and asked Gross to open the door. After Gross opened the passenger door, Boucard stood between the open door and the interior of the car to speak with Gross. Boucard asked Gross for her name, age, race, birthday, social security number, and address. According to Boucard, Gross became irritated with his questions. When Gross asked why she had to give her address, Boucard told her that they were investigating suspicious activity and that he had the right to ask her who she was. Boucard told Gross that she had to identify herself to his satisfaction, which she had not done.

When Boucard asked Gross if she knew the people at the house where Stroot had pointed, Gross responded that she did. Boucard told Gross that Stroot had admitted he was lying. At that point, Gross admitted that she was lying and that she was not there to see a friend at the house.

While he was speaking with Gross, Boucard smelled an odor of burnt marijuana coming from the interior of the car. After he smelled the odor of burnt marijuana, Boucard ordered Gross out of the car because a search of the car was going to be performed. Boucard testified that 10 to 15 minutes had elapsed between his initial contact with Stroot and when Gross was ordered out of the car. On the other hand, Mains testified that the search of the car occurred approximately 45 minutes after the initial stop. During the search of the car, Mains discovered some residue on the front passenger seat, a piece of glass that appeared to be a crack pipe, and an Altoids tin containing what appeared to be marijuana. Field testing of the residue from the front passenger seat indicated the possible presence of cocaine.

According to Boucard, Mains had backed up the patrol car and had pulled it behind Stroot's car when he ordered Stroot to the back of the patrol car. Boucard further testified that although the patrol car's emergency lights were not activated when they first

made contact with Stroot, the lights were turned on after Mains had moved the car behind Stroot's car. On the other hand, Mains testified that he thought he moved the patrol car behind Stroot's car and activated the emergency lights after he found the items in the car.

Around the time that the items were discovered during the car search, Gross said that she needed to use the bathroom and began walking away from the scene. According to Boucard, Gross was taking small steps and walking "like her knees were locked together." At that point, Boucard called a female officer to the scene to do a patdown and search. Gross was placed in the back of a patrol car and interviewed by another officer who was at the scene.

At approximately 5:32 p.m., Boucard interviewed Stroot about the items found in the car. At that point, Stroot had waived his *Miranda* rights. During the interview, Stroot denied any knowledge of drugs or drug paraphernalia found in the car. Stroot stated that after he had parked the car, he had heard some movement of Gross' coat, and Gross had stated, "Oh shit."

When female Officer Brandi Turner arrived at the scene, she had Gross get out of the patrol car. Before searching Gross, Turner asked Gross if she had anything illegal on her. Gross stated that she did not. Gross was searched at approximately 5:56 p.m. During the search, Gross stated that she had something illegal "in her private area." As Turner continued searching Gross, Turner felt a long, hard object in Gross' underwear. Turner then took Gross to Turner's patrol car, took off Gross' handcuffs, and placed her in the back of the patrol car. After blocking the view, Turner asked Gross to remove the items that she had in her underwear. Gross removed two glass pipes containing a white substance and small pieces of a copper Brillo pad. Gross told Turner that the Brillo was used as a filter when she smoked crack. Turner told Gross that if she had anything like loose rocks, she should remove them also because they could make her sick. Gross then reached into her jeans and produced two white rocks.

Gross was charged with one count of possession of cocaine in violation of K.S.A. 2004 Supp. 65-4160(a). Before trial, Gross moved to suppress the evidence seized during the stop and search

of the car in which she was a passenger and during the search of her person, as well as all other evidence or statements obtained as a product of the searches. Gross argued that the officers did not have reasonable suspicion or probable cause to seize her or the car, nor did they have probable cause to search her or the car.

After an evidentiary hearing, the trial court (Judge Clark V. Owens II) found that the officers were entitled to briefly detain Stroot to discuss the parking violation of parking too close to a driveway. In addition, the trial court found that the 10-15 minute detention between the officers' initial contact with Stroot and the detection of the marijuana odor in the car was not unreasonable due to the suspicion created by Stroot's nervousness and the initial discrepancy in travel plans regarding the story of visiting a friend, followed by the admission of lying. The trial court further found that once Boucard detected the odor of marijuana in the car, the officers had articulable suspicion that the car might contain marijuana. Finally, the trial court determined that after the items were found in the car, the officers were justified in arresting and conducting a pat-down search of Gross. Accordingly, the trial court denied Gross' motion to suppress.

At a bench trial, the trial court (Judge David J. Kaufman) found Gross guilty of possession of cocaine. Gross was placed on probation for 12 months with an underlying 10-month prison sentence.

*I. Did the trial court err in denying Gross' motion to suppress?*

On appeal, Gross argues that the trial court erred in denying her motion to suppress. Gross maintains that the detention and interrogation in this case exceeded the proper duration and scope of a parking violation investigation. Moreover, Gross contends that the officers did not have reasonable and articulable suspicion of criminal activity to support a continued detention and investigation.

When reviewing a trial court's decision regarding suppression of evidence, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. An appellate court does not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.

*State v. Ackward,* 281 Kan. 2, 8, 128 P.3d 382 (2006). The State bears the burden of proof for a suppression motion. The State must prove to the trial court the lawfulness of the search and seizure. *State v. Ibarra,* 282 Kan. 530, 533, 147 P.3d 842 (2006).

*A. Was the officers' initial encounter with Gross a voluntary encounter?*

The State first argues that Gross' encounter with the officers in this case was not a detention but was a voluntary encounter up to the moment that Boucard smelled an odor of burnt marijuana in the car. As Gross points out, the State made a similar argument at the trial court level, but it was rejected. Gross argues that because the State failed to cross-appeal the trial court's decision on that issue, it should not be allowed to now raise the argument on appeal.

Nevertheless, this court applies the rule that if a trial court reaches the right result, its decision will be upheld even though the trial court relied upon the wrong ground or assigned erroneous reasons for its decision. The reason given by the trial court for its ruling is immaterial if the result is correct. *State v. Hoge,* 283 Kan. 219, 225-26, 150 P.3d 905 (2007). Here, if the initial encounter between Gross and the officers was voluntary, the trial court's decision to deny Gross' motion to suppress can be upheld. We now turn our attention to whether the initial encounter between Gross and the officers was voluntary.

Kansas appellate courts have recognized that encounters between law enforcement officers and citizens may be categorized into four types: voluntary encounters, investigatory stops, public safety stops, and arrests. *State v. Gonzales,* 36 Kan. App. 2d 446, 451, 141 P.3d 501 (2006). The Fourth Amendment to the United States Constitution protects an individual against "unreasonable searches and seizures." *State v. Morris,* 276 Kan. 11, 17, 72 P.3d 570 (2003). "'The Fourth Amendment 'applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.' [Citation omitted.] This requires an officer to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity. [Citations omitted.]" *State v. Epperson,* 237 Kan. 707, 712, 703 P.2d 761 (1985).

Nevertheless, a voluntary encounter between a police officer and a citizen does not constitute a seizure and does not implicate the Fourth Amendment. *State v. Crowder*, 20 Kan. App. 2d 117, Syl. ¶ 2, 887 P.2d 698 (1994). "'[L]aw enforcement interaction with a person is consensual, not a seizure if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter. [Citations omitted.]" *State v. Thompson*, 284 Kan. 763, 775-76, 166 P.3d 1015 (2007).

Once a voluntary detention loses its consensual nature and becomes an investigatory detention, there must be reasonable suspicion, based upon objective facts, that the individual was or is involved in criminal activity. See *Epperson*, 237 Kan. at 712. An officer has seized a person when there is an application of physical force or a show of authority which, under the totality of circumstances, would cause a reasonable person to feel that he or she is not free to leave. *Morris*, 276 Kan. at 18-19 (applying United States Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547 [1991]).

Citing *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), the State contends that there are seven relevant factors for a court to consider when determining whether a seizure has taken place. Nevertheless, the *Mendenhall* Court did not develop a factor-based test. Rather, in the principal opinion of *Mendenhall*, Justice Stewart wrote that seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. at 554. Justice Stewart then offered examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [Citations omitted.]" 446 U.S. at 554.

Recognizing that a totality of the circumstances test under the Fourth Amendment does not turn on a particular factor, our Supreme Court in *Thompson* stated: "In applying the totality of the

circumstances test in a Fourth Amendment context, no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances." 284 Kan. 763, Syl. ¶ 20. Our Supreme Court further held that "[b]ecause the determination of whether a reasonable person would feel free to terminate an encounter or refuse to answer questions is fact-driven, no list of factors can be exhaustive or exclusive." 284 Kan. 763, Syl. ¶ 24.

Based on the test developed by the United States Supreme Court and adopted and applied by our Supreme Court, the question we must determine is whether the law enforcement officers' conduct in this case would have conveyed to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter. See *Thompson*, 284 Kan. at 775-76.

Based on the trial court's findings and the undisputed testimony in this case, the evidence established that as Stroot parked and got out of his car, two officers in a patrol car parked parallel to Stroot's car. While Stroot was walking to a house, Boucard called out to Stroot and asked him where he was going. Boucard eventually ordered Stroot to the back of the patrol car where he questioned him further. Boucard asked Stroot about his drug history and his relationship with Gross. While Stroot was being questioned, both Boucard and Mains were out of the patrol car. Mains approached Gross, who was seated in Stroot's car, and asked her questions about where she was going. Gross was reluctant to answer Mains' questions. Mains eventually walked back to where Boucard and Stroot were standing and confronted Stroot with the answers he had received from Gross. Stroot admitted that he had lied about going to see a friend. Boucard then walked to Stroot's car and asked Gross to open her door. Gross was again reluctant to answer any questions, but Boucard told her that he was entitled to the information.

Although the trial court apparently found that either the window or door was open when Mains approached the passenger side of the car, Mains' testimony on cross-examination establishes that he directed Gross to roll down the window or open the door. Specif-

ically, when defense counsel questioned Mains about his initial contact with Gross, Mains testified as follows:

"[Defense counsel:] . . . [W]hen you talked to Ms. Gross, you didn't smell anything unusual from the car?

"[Mains:] No.

"[Defense counsel:] And you had her roll the window down or open the door, didn't you?

"[Mains:] Yes.

"[Defense counsel:] So she was complying with your directions when she talked with you?

"[Mains:] Correct."

Some jurisdictions have indicated that a seizure occurs for purposes of the Fourth Amendment when an officer approaches a parked car and orders the occupant to open the door or roll down the window. See *State v. Patterson*, 868 A.2d 188 (Me.), *cert. denied* 546 U.S. 815 (2005); *Borowicz v. N.D. Dep't of Transp.*, 529 N.W.2d 186, 188 (N.D. 1995) (noting that seizure arguably occurred where requests to open door and to produce driver's license could be interpreted as order). Similarly, 4 LaFave, Search and Seizure § 9.4(a), p. 433 (4th ed. 2004), indicates that an encounter is not voluntary when an officer commands a suspect to open his or her door or roll down the window:

"[T]he mere approach and questioning of such persons does not constitute a seizure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the window and perhaps even open the door if the occupant is asleep. *A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so.*" (Emphasis added.)

Turning to our standard of review in this case, we must determine whether, under the totality of the circumstances, the officers' conduct would have conveyed to a reasonable person in Gross' position that she was free to refuse the officers' requests or otherwise end the encounter. Here, when Gross was directed by Mains to roll down the window or open the passenger door, she was being detained for investigative purposes. At that point, the officers had made a show of authority and restricted the movement of both Stroot and Gross. Stroot had been detained when he was

ordered to the back of the patrol car after attempting to walk away from his car and the patrol car. Gross became an object of this investigative detention when Mains approached the passenger side of Stroot's car, directed her to roll down her window or open the door, and began questioning her. The officers' show of authority prevented Gross and Stroot from leaving the area.

Stroot was prevented from walking away from the car by Boucard, and Gross' point of exit from the car was being blocked by Mains while he asked her questions. Consequently, Gross' movement was restricted or curtailed by Mains' action. In addition, the patrol car was parked either parallel to Stroot's car or behind Stroot's car with the emergency lights activated. At that point, the officers were in control, and Stroot and Gross were obeying. Although Gross was reluctant to answer Mains' questions, he persisted until she answered them. It became clear that the officers were not going to leave Stroot and Gross alone until the officers got the information they wanted. A reasonable person in Gross' position would not have felt free to disregard the officers' requests and terminate the encounter.

Importantly, in her appellate brief, Gross focuses on the fact that Boucard testified that when he ordered Stroot to the back of the patrol car, Stroot and Gross were detained and were not free to leave. The State properly points out that the test for whether a seizure has occurred is an objective one, and the subjective intent of a law enforcement officer is normally irrelevant to such determination. Nevertheless, our Supreme Court has recognized that an officer's subjective intent is relevant if the person being detained is somehow made aware of this intent. See *Thompson*, 284 Kan. at 806. Here, the officer's subjective intent that Stroot and Gross were not free to leave was demonstrated by the officers' obvious show of authority towards Stroot and Gross. Specifically, as discussed previously, Mains ordered Gross to roll down her window or open her door so that he could speak with her. Moreover, as the detention continued, Boucard blocked Gross' exit from the car by standing between the passenger door and the car and told Gross that he was entitled to the information he requested and that she had to answer his questions to his satisfaction. This provided further evi-

dence that Gross was subjected to an ongoing detention. Such a show of authority would continue to communicate to a reasonable person in Gross' position that he or she could not disregard the officer's questions and terminate the encounter.

The State attempts to fit the facts of this case within *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979). In *Marks*, an officer saw two men inside a parked car who fit the general description of two men mentioned in a police dispatch who were wanted by the police. The officer walked over to the car and asked the driver for his name and some identification. When the driver lifted up an armrest in the middle of the seat, the officer saw a handgun lying in the seat and then saw the defendant reach in the direction of the gun. At that point, the officer drew his handgun, ordered the driver not to touch the gun, and arrested the driver. Our Supreme Court held that the defendant had not been detained or seized when the officer asked for his name and identification. Because there was no unlawful detention and the officer saw the gun in plain view, the officer properly seized the gun without a warrant.

Unlike the present case, the officer in *Marks* merely approached a parked car and asked the driver's name and identification. There was no indication that the officer in *Marks* exercised his authority by calling out orders to the driver and occupant of the car or by restricting their ability to leave. In this case, however, the officers exercised their authority by ordering Stroot back to the patrol car and by directing Gross to roll down her window or open her car door. Moreover, the officers significantly restricted Gross' and Stroot's movement by not allowing Stroot to walk away from the car, by standing beside the passenger side of the car while speaking with Gross, and by parking either parallel to Stroot's car or behind Stroot's car with the emergency lights activated. An individual is seized when an officer displays his or her authority and restrains the person's freedom to leave. *State v. Hill*, 281 Kan. 136, 142, 130 P.3d 1 (2006). The officers' show of authority, along with their restraint of Stroot's and Gross' movement, rendered the encounter in this case an investigative detention.

Based on the officers' actions from the beginning of Boucard's encounter with Stroot at the back of the patrol car and Gross' initial

encounter with Mains to the point where Boucard smelled marijuana, a reasonable person in Gross' position would not have felt free to disregard the officers and terminate the encounter. Therefore, the trial court was correct in its determination that the encounter was an investigative detention.

### B. Did the officers have reasonable suspicion of criminal activity?

As a result, this case turns on whether the officers had reasonable suspicion that Gross was involved in criminal activity when their encounter with Gross turned into an investigative detention. K.S.A. 22-2402(1) states that "[w]ithout making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions." This statute is a codification of the search and seizure principles set forth in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S.Ct. 1868 (1968). *State v. Field*, 252 Kan. 657, 659, 847 P.2d 1280 (1993).

#### 1. Parking Violation

When the detention occurred in this case, it is undisputed that the officers had observed Stroot commit a parking violation. Illegal parking under K.S.A. 8-157 is classified as a traffic infraction. See K.S.A. 8-2116(a); K.S.A. 8-2118. Traffic infractions are crimes under K.S.A. 21-3105. Because the officers had reasonable suspicion that a traffic violation had occurred, the officers could have briefly detained Stroot to issue him a ticket for the parking violation. See K.S.A. 8-2106(a)(1) (indicating that officer has authority to stop person and issue citation for traffic violation); K.S.A. 12-4211(d) (giving municipal officer who observes ordinance violation the authority to serve upon offender a complaint and notice to appear); *United States v. Buckhannon*, 975 F. Supp. 1432, 1434 (D. Kan. 1997) (officer had reasonable suspicion that traffic violation occurred as defendant was parked in posted no parking area and thus investigative detention was justified).

Nevertheless, the scope and duration of a seizure or an investigative detention must be strictly tied to and justified by the circumstances that rendered its initiation proper. *State v. Damm*, 246 Kan. 220, 224, 787 P.2d 1185 (1990); *State v. Schneider*, 32 Kan. App. 2d 258, 262, 80 P.3d 1184 (2003). "An investigative detention must last no longer than is necessary to effectuate the purpose of the stop. [Citation omitted.]" *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998). " 'To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." [Citations omitted.]' " *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998).

Although arguably the initial stop of Stroot might have been justified by the minor traffic infraction, the scope of the detention would have been limited to the officers issuing a traffic citation. In its appellate brief, the State indicates that because the detention took 15 minutes or less, the detention was not unreasonable. Yet, under the facts presented in this case, the detention extended beyond the length necessary for its only legitimate purpose—the issuance of a warning or a citation for illegal parking. See *United States v. Guzman*, 864 F.2d 1512, 1519 n.8 (10th Cir. 1988), *overruled on other grounds United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

The record indicates that almost the entire questioning by the officers related to pursuing their initial hunch that Stroot and Gross were involved in something suspicious. After Boucard initially told Stroot that he was parked too close to a driveway, the rest of the officers' questions did not relate to the parking violation. There is no indication that Stroot was ever issued a citation for parking too close to the driveway. Instead, Boucard proceeded to question Stroot about where he was going, his relationship with the passenger, and his drug history. Such questioning was not within the scope of a detention for a parking violation. See *Schneider*, 32 Kan. App. 2d at 262-63 (holding that detention was not reasonably related in scope to traffic stop where defendant was never asked for

his driver's license, registration, or proof of insurance; no indication that officers planned to issue defendant a traffic citation; and officers' questions to defendant were unrelated to traffic infraction).

Moreover, Boucard's and Mains' questioning of Gross was clearly not justified by the parking violation. As the passenger in the car, she had nothing to do with the commission of the parking violation. Because Boucard had already detained Stroot, there was no reason to gather any information from Gross in order to issue a parking citation. The detention of Gross exceeded the permissible scope of a stop for a parking violation, especially when Gross was not the driver of the car.

### 2. Reasonable Suspicion of Other Criminal Activity

The question now turns to whether the officers had reasonable suspicion of other criminal activity to justify Gross' detention on matters unrelated to the parking violation. See *Mitchell*, 265 Kan. at 245 (To justify a temporary detention for questioning during a routine traffic stop, the officer must have reasonable suspicion of illegal transactions in drugs or of any other serious crime.).

For reasonable suspicion to exist, there must be " ' "a particularized and objective basis" for suspecting the person stopped of criminal activity.' [Citation omitted.]" *DeMarco*, 263 Kan. at 735. The officer must be able to articulate something more than an " 'inchoate or an unparticularized suspicion or "hunch." ' [Citation omitted.]" *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989).

When evaluating an officer's reasonable suspicion, we judge the officer's conduct in light of common sense and ordinary human experience. Our task is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Instead, we determine whether the totality of circumstances justifies the detention. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, remembering that reasonable suspicion requires a minimum level of objective justification. *DeMarco*, 263 Kan. at 735.

The trial court found that, based upon a discrepancy in travel plans, Stroot's nervousness in speaking with Boucard, and Stroot's eventual admission that he was lying about where he was going, the officers had reasonable suspicion for the 10- to 15-minute detention that occurred before Boucard smelled the odor of burnt marijuana.

### a. Admissions of Lying

Gross argues that her and Stroot's admissions that they were lying cannot be used to support reasonable suspicion to justify the ongoing detention because the officers had already unlawfully exceeded the scope of the initial detention before eliciting the admissions of lying. Gross is correct. In determining whether law enforcement officers have reasonable suspicion of criminal activity, a court focuses exclusively on the officers' knowledge of facts at the moment of the stop or seizure. *State v. Poage*, 35 Kan. App. 2d 266, 269, 129 P.3d 641 (2006) (determining that trial court erred it its reference to and apparent reliance on contraband recovered in defendant's possession after stop); see also *DeMarco*, 263 Kan. at 734 (recognizing that case turned on whether officer, without unlawfully exceeding scope of traffic stop detention, had gained reasonable and articulable suspicion of criminal activity sufficient to justify searching trunk).

Here, based on our previous analysis, the encounter was an investigative detention unrelated to the parking violation once Boucard ordered Stroot to the rear of the patrol car for questioning. Gross' liberty was restrained when Mains approached the passenger side of Stroot's car, directed Gross to roll down the window or open the door, and proceeded to question Gross. At that point, the officers did not have reasonable suspicion to detain Gross, and her detention was unlawful under the Fourth Amendment. Any information gathered from Stroot and Gross after they were restrained was tainted by the unlawful detention and cannot be used to support reasonable suspicion for Gross' detention and resulting search. See *State v. Little*, 60 F.3d 708, 714 (10th Cir. 1995) (defendant's responses to questions after she was unlawfully restrained were

tainted by her illegal detention and could not be used to determine whether there was reasonable suspicion for search).

### b. Discrepancy in Travel Plans

Gross next challenges the trial court's factual finding concerning a discrepancy in travel plans. As Gross points out, Boucard testified that both Stroot and Gross indicated that they were visiting the same house. The only discrepancy between Gross' and Stroot's statements concerning their destination appears to be that Gross said they were going to see *her* friend, and Stroot said they were going to see *a* friend. Based on the fact that they were in a relationship and would have had mutual friends, Stroot's and Gross' responses do not appear to be inconsistent. Moreover, because Gross gave Mains this information after she was detained, her responses cannot not be used to establish reasonable suspicion to support the detention. See *Little*, 60 F.3d at 714.

Importantly, in discussing the discrepancy in travel plans, the trial court found that Stroot gave "inconsistent," "suspicious," and "unusual" answers to the officers regarding his destination. What appeared to be problematic for the officers was that Stroot and Gross could not give the name of the friend they were visiting. As Gross points out, however, the failure of her and Stroot to provide the name of the friend they were visiting could have just as easily stemmed from a refusal to answer the question as from a lack of knowledge. Gross' and Stroot's refusal or inability to give the name of the friend did not establish a discrepancy in travel plans. Moreover, as discussed in the previous paragraph, Gross' response was made after she was detained and cannot not be used to establish reasonable suspicion to support the detention. See *Little*, 60 F.3d at 714. As a result, the trial court's findings regarding the discrepancy in travel plans are not supported by substantial competent evidence in the record.

### c. Facts Known to the Officers Before the Detention

Moreover, even if Stroot's responses to the officers' questions before the detention constituted a discrepancy in travel plans, we must determine whether that fact, when considered with the other

facts known to the officers when the detention occurred, was sufficient to establish reasonable suspicion. The trial court cited several Tenth Circuit federal cases where a discrepancy in travel plans, along with other facts, created reasonable suspicion. Nevertheless, unlike the present case, the officers in those cases were able to articulate major inconsistencies and implausible explanations in the detained individuals' statements, or the officers had made observations that were consistent with drug activity. Moreover, many of those cases cannot be accurately compared to the instant case because they involved cross-country travel along a drug corridor.

For example in *United States v. Kopp*, 45 F.3d 1450 (10th Cir. 1995), the court held that there was reasonable suspicion to detain the driver where the driver told the officer he was driving from California to North Carolina merely to take a very dilapidated sofa to friends; the defendant did not know where the city he was taking the sofa to was located in North Carolina; the defendant's story was inconsistent with the passenger's story about when they were returning to California; the passenger gave inconsistent responses as to how long he had known defendant and how long he had been living in California; and the defendant was hesitant in answering questions during the traffic stop and was shaking and fidgeting. In *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996), the court held that the officers had reasonable suspicion to briefly detain the driver where the driver, who had been stopped in Utah, said that he had rented the car and was going to a wedding in New York, but the rental papers indicated the car was due back in Los Angeles in 2 days; the defendant adjusted his mirror and intensely watched the officer when the officer returned to the patrol car to issue a citation and warning; the defendant lied about his criminal record; and the defendant was nervous when asked about his criminal record.

Moreover, in *United States v. Mendez*, 118 F.3d 1426 (10th Cir. 1997), the court determined there was reasonable suspicion to detain the driver where the driver said he was going to visit his sister in Colorado but claimed that the car, which was registered in Arizona, belonged to his sister's husband; the defendant could not tell the officer his sister's address; and the officer observed a dis-

located dashboard and dismounted radio inside the car, which was consistent with hiding drugs inside the car. The court in *United States v. Sanchez-Valderuten*, 11 F.3d 985 (10th Cir. 1993), held that there was reasonable suspicion to support the detention where the officer smelled coffee and air freshener, which combination was known to be used by drug transporters to cover the smell of a controlled substance; the defendant evaded the officer's questions concerning his point of departure; and it was unusual for the defendant to be traveling on I-70 based on his answers that he was going to New York but was moving his family to Washington.

In this case, the facts known to the officers when they detained Gross fall way short of the facts described in the Tenth Circuit cases cited by the trial court. The State, for example, points to the following facts known to the officers before the detention that would have given them reasonable suspicion to believe that contraband or evidence of a crime would be located inside Stroot's car: Stroot acted suspiciously by snapping his head around and promptly getting inside his car and driving away when he first spotted the patrol car; Stroot pulled to an abrupt stop and got out of his car after driving only 100 to 200 feet; Stroot was unable to provide the name of the friend he was visiting when he was questioned by Boucard; Stroot repeatedly looked inside his car while speaking with Boucard; and Boucard saw a passenger in Stroot's car. Nevertheless, the officers were unable to point to anything that they had observed that would connect Gross with criminal activity.

The trial court in this case cited nervousness as one of the factors giving rise to reasonable suspicion. We point out that nervousness alone does not give rise to reasonable suspicion. See *DeMarco*, 263 Kan. at 738. Although nervousness along with other suspicious circumstances might contribute to a finding of articulable suspicion, this factor should be considered with caution in light of the fact that most individuals are likely to exhibit some signs of nervousness when confronted by police. Concluding that the defendant's nervousness alone did not provide a reasonable suspicion of illegal activity, our Supreme Court in *DeMarco* quoted *United States v. Hall*, 978 F.2d 616, 621 n.4 (10th Cir. 1992), as follows:

" 'While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials, even recognizing that reasonable suspicion may be the sum of noncriminal acts and is based on the totality of circumstances, see *Sokolow*, 490 U.S. [1,] 7-10, [104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989),]. As we recently observed:

" ' "In all search and seizure cases of the type here concerned, the government argues that a defendant's nervousness, either alone or in conjunction with other factors, supports the contested search or seizure. This repetitive assertion by the Government in all cases of this kind must be treated with caution. It is common knowledge that most citizens . . . whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness." [Citations omitted.]' " 263 Kan. at 738.

At the suppression hearing, neither officer was able to point to anything they discovered in their initial encounter with Stroot that would cause them to reasonably suspect that either Gross or Stroot was involved in drug activity or that evidence of drug activity would be found in the car. Specifically, when questioned by defense counsel during cross-examination, Boucard acknowledged that all he knew when he ordered Stroot to the back of the patrol car was that Stroot had committed a traffic infraction and that he was suspicious about Stroot wanting to leave the car. Consistent with Boucard's testimony, Mains acknowledged that when he went to talk to Gross, the only thing that had happened was the parking violation and that he had suspicions of nothing else. Essentially, when Boucard ordered Stroot to the back of the patrol car and Mains approached Gross, all the officers had was a hunch that there was something suspicious going on and that Stroot and Gross might be involved in criminal activity. The totality of the circumstances known to the officers when the detention occurred did not provide a specific and articulable basis to create a reasonable suspicion that Gross had committed or was about to commit a crime. Without more facts providing an articulable basis for reasonable suspicion that Gross had committed, was committing, or was about to commit a crime, the officers could not lawfully detain Gross to prove their hunch.

In summary, when the officers detained Gross, they had exceeded the scope of any stop or detention for Stroot's parking vi-

olation. At that point, the officers did not have reasonable suspicion that Gross was involved in criminal activity to justify her detention. Any evidence that is obtained as a result of an unlawful stop or detention must be suppressed as fruit of the poisonous tree. See *State v. Epperson*, 237 Kan. 707, 718-19, 703 P.2d 761 (1985) (following *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 [1963]). As a result, the evidence obtained during the course of the unlawful detention and the resulting search of Gross must be suppressed.

## II. *Was Gross unlawfully subjected to a body cavity search?*

Finally, Gross argues that Officer Turner's direction that she take items from her private area constituted a body cavity search under K.S.A. 22-2520 and was unlawfully conducted without a warrant in violation of K.S.A. 22-2522. Gross contends that the items seized as a result of this search should have been excluded from evidence at trial. Nevertheless, because we have already determined that the evidence obtained during the search of Gross must be suppressed, this issue is moot.

Reversed and remanded for a new trial without the evidence obtained during the unlawful detention, including the evidence seized in the search of the car and the evidence obtained during the search of Gross.