No. 98,123

STATE OF KANSAS, *Appellee*, v. RUBY N. THOMAS, *Appellant*.

(246 P.3d 678)

Review of the judgment of the Court of Appeals in an unpublished opinion filed September 12, 2008. Opinion filed January 21 , 2011.

*Carl Folsom, III.*, of Bell Folsom, P.A., of Lawrence, argued the cause and was on the briefs for appellant.

*Tony Cruz*, assistant county attorney, argued the cause, and *Paul Morrison*, attorney general, joined him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: The district court denied Ruby N. Thomas' motion to suppress, convicted her of possession of cocaine, and determined that her statutory right to a speedy trial was not violated. The Court of Appeals affirmed her conviction, vacated her sentence, and remanded the case to the district court for resentencing on the probation term.

Thomas petitioned for review of three issues, not including the sentencing issue decided by the Court of Appeals. We granted her petition under K.S.A. 20-3018(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in denying Thomas' motion to suppress? Yes.
2. Was Thomas denied her statutory right to a speedy trial? No.
3. Did the district court violate Thomas' Sixth Amendment rights by admitting a KBI forensic lab report without requiring the forensic examiner to testify? Issue not preserved for appeal.

Accordingly, we reverse the defendant's conviction and remand for new trial.

FACTS

On December 19, 2005, Junction City police officer Josh Brown

was on patrol and spotted Ruby Thomas walking in the 1300 block of North Webster at 8:48 p.m. Officer Brown possessed a subpoena for L.N., and believing Thomas was L.N., stopped his patrol car. He did not activate his car's emergency lights. Because it was nighttime, his headlights remained illuminated, and the dashboard camera recorded the following events.

Officer Brown exited his car and approached Thomas to ask whether she was L.N. Thomas provided her name but was unable to produce identification. She answered a few basic questions and told Brown she was heading home from the house of a friend named Frank. Based on this information, Brown determined that she was not L.N. He next asked for her permission to fill out a field interview card. After assurances that she was "not in trouble," Thomas agreed to provide the requested information.

Officer Brown was to testify later that when Thomas provided her address, he was reminded of a prior visit there when Thomas' husband, while intoxicated, had called 911 and complained that Thomas had left their house with a drug dealer. When asked, Thomas was now unable to recall her social security number. Brown spoke into his shoulder radio and later appeared to receive information about Thomas from police dispatch. While filling out the interview card, Brown advised Thomas that she was not under arrest. Twice he informed her that she was free to leave. After Brown completed the card, he and Thomas shook hands and said goodbye. The encounter lasted approximately 5 minutes. Both parties maintained a friendly tone.

Thomas turned her back to Officer Brown and walked away. When she was about 10-15 feet from Brown, he called out, "Hey, Ms. Ruby, can I ask you a couple more questions real quick?" Thomas turned around, walked back to Brown, and agreed to answer further questions.

Officer Brown started this stage by saying, "The more I talk to you, the more I was getting reminded of who you were." When he asked, Thomas indicated that she was recently at "Frank's house." Brown inquired whether it was the same "Frank's house" where drugs and drug paraphernalia had recently been confiscated. Tho-

mas acknowledged it was the same house but denied involvement in that incident.

Officer Brown then asked Thomas if she had used drugs or consumed alcohol earlier that day. Thomas admitted to consuming alcohol but denied using drugs. Brown explained that he was asking because the area around Frank's house is known for drugs and because of the earlier 911 incident involving Thomas' husband. Brown continued asking about drugs and drug paraphernalia and whether Thomas and/or her friends were currently using illegal drugs. Thomas again denied that she was using drugs. She further denied that she was in possession of drugs or drug paraphernalia. According to Brown, she did not appear to be under the influence of drugs.

Brown told Thomas to "be honest with me," and with her standing 2-3 feet away from him, spoke into his shoulder radio. He radioed, "Are you 10-6? 10-4. Can you come up here to North 1300 Webster?" After using his radio, Brown again asked Thomas if she had drugs or paraphernalia on her person. Thomas responded "no" and emptied her pockets. Brown asked to feel inside her pockets for drugs, and Thomas threw her hands into the air. After Brown again told Thomas to "be honest with me," she admitted that she was in possession of two crack pipes, which she had found on the ground. At no time during this second stage did Brown inform Thomas that she was free to leave.

Brown again used his shoulder radio, this time to specifically inquire about the status of a female officer who could pat down Thomas. He then placed Thomas under arrest. Thomas waived her *Miranda* warnings and later made incriminating statements about her use of cocaine that evening and in the past.

The State charged Thomas with possession of cocaine found in the crack pipes. She filed a pretrial motion to suppress all evidence obtained during the second stage of the encounter with Officer Brown, alleging it was an investigatory detention unsupported by reasonable suspicion. After an evidentiary hearing, the district court determined that the encounter between Thomas and Brown was voluntary and denied the motion:

"This is a very close case, however, the Court finds that in this particular case and under these circumstances that discovery of the evidence does not violate the Fourth Amendment. The officer told the Defendant on several occasions she had the right to leave, that she was not under arrest. When confronted with the question as to whether or not she had anything in her pockets, she said no. The officer then asked her if he could look in her pockets at which time she threw her hands up and admitted she had two crack pipes in her pocket. Actually, there was never a search involved. She admitted to a crime and was placed under arrest and made incriminating statements after being given the *Miranda* warning. Therefore, her statements are admissible against her."

After a bench trial, the judge found Thomas guilty. Thomas appealed four issues, and a Court of Appeals panel reversed the district court on the probation term but affirmed the three remaining issues. *State v. Thomas*, 2008 WL 4222877 (Kan. App. 2008) (unpublished opinion). We granted Thomas' petition for review on the three issues decided adversely to her by the panel.

More facts will be added as necessary to the analysis.

Issue 1: *The district court erred in denying Thomas' motion to suppress*

Thomas argues that the district court improperly denied her motion to suppress. She does not contest the encounter that began when Officer Brown stopped her to determine if she was L.N. and ended when she said good-bye and walked away. She does dispute what she refers to as the second encounter, which she claims began when Brown called out to ask if she would answer more questions and ended with her arrest.

More specifically, Thomas argues that the second encounter was an involuntary, investigatory detention unsupported by reasonable suspicion of criminal activity. In contrast to the first encounter, she contends that the second involved accusatory and repetitious questions about illegal activity and included Officer Brown's call for a back-up officer. As a result, Thomas argues that all evidence obtained must be excluded as fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

The State responds that the entire episode, *e.g.*, both stages, was consensual. It argues that Thomas agreed to answer questions, that

Brown's questions were "not so coercive as to make this encounter a detention," and that the call for back-up, alone, was insufficient to turn the encounter into an investigatory detention.

### Standard of review

When reviewing general motions to suppress evidence, our standard of review is well known:

" ' "[T]his court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. [Citation omitted.] The State bears the burden to demonstrate that a challenged search or seizure was lawful. [Citation omitted.]" ' " *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 (2010) (quoting *State v. Morlock*, 289 Kan. 980, 985, 218 P.3d 801 [2009]).

Because the parties do not dispute the material facts, our suppression question is solely one of law. See *State v. Ingram*, 279 Kan. 745, 751, 113 P.3d 228 (2005). Therefore, we must only determine as a matter of law whether the second stage of the encounter was consensual or, if it was an investigatory detention, whether it was supported by reasonable suspicion.

### Investigatory detention

We begin our analysis by acknowledging that a voluntary encounter is not considered a seizure and is not afforded protection by the Fourth Amendment to the United States Constitution. *McGinnis*, 290 Kan. at 551 (citing *State v. Morris*, 276 Kan. 11, 19, 72 P.3d 570 [2003]). As a result, if we hold that the second stage of encounter was voluntary, *i.e.*, consensual, then the drug evidence was properly obtained.

Our recent opinion in *State v. McGinnis*, which like the instant case, concerned an officer's questioning and eventual arrest of a pedestrian, provides our frame of reference for this issue:

"The United States Supreme Court has developed a 'totality of the circumstances' test to determine if there is a seizure, or instead a consensual encounter. See *State v. Thompson*, 284 Kan. 763, 775, 166 P.3d 1015 (2007). '[U]nder the test, law enforcement interaction with a person is consensual, not a seizure if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter.' 284 Kan. at 775. Stated another way, ' "[s]o long

as a reasonable person would feel free to 'disregard the police and go about his business,' [citation omitted], the encounter is consensual and no reasonable suspicion is required." ' *State v. Reason*, 263 Kan. 405, 410, 951 P.2d 538 (1997) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 [1991] ). Consequently, in *Reason* we held that only if ' " 'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " ' 263 Kan. at 410-11.

"The standard of appellate review for this specific subset of suppression determinations—the trial court's decision of whether the encounter is consensual or a seizure—is quite similar to the standard for general suppression of evidence:

'Appellate review of the trial court's determination of whether a reasonable person would feel free to refuse the officer's requests or otherwise terminate the encounter consists of two parts: (1) the factual underpinnings are reviewed under a substantial competent evidence standard and (2) the ultimate legal conclusion drawn from those facts, *i.e.*, whether a reasonable person would feel free to refuse the requests or to otherwise terminate the encounter, is reviewed under a de novo standard.' *Thompson*, 284 Kan. at 776 (citing *Moore*, 283 Kan. at 352).

"We begin our analysis by acknowledging that a seizure does not occur simply because a police officer approaches an individual and asks a few questions:

'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . . [Citations omitted.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation omitted.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations omitted.]' *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).

See *Thompson*, 284 Kan. 763, Syl. ¶ 17 ('Law enforcement questioning, by itself, is unlikely to result in a Fourth Amendment violation. Unless the surrounding conditions are so intimidating as to demonstrate that a reasonable person would have believed he or she was not free to disregard the questions, there has been no intrusion upon the detained person's liberty or privacy that would implicate the Fourth Amendment.').

"Accordingly, over the years we have recognized several objective factors to help determine whether a law enforcement-citizen encounter is voluntary or an investigatory detention. This nonexhaustive and nonexclusive list includes: the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or to approach, and an attempt to control the ability to flee. See *State v. Lee*, 283 Kan. 771, 775, 156 P.3d 1284 (2007); *State v. Morris*, 276 Kan.

11, 19-20, 72 P.3d 570 (2003); *State v. Gross*, 39 Kan. App. 2d 788, 798-800, 184 P.3d 978 (2008).

"There is no rigid application of these factors; instead, we analyze the facts of each case independently. We have held that '[i]n applying the totality of the circumstances test in a Fourth Amendment context, no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances.' *Thompson*, 284 Kan. 763, Syl. ¶ 20. On the other hand, 'we do not expect courts to merely count the number of factors weighing on one side of the determination or the other. In the totality of the circumstances, a factor may be more indicative of a coercive atmosphere in one case than in another. [Citations omitted.]' 284 Kan. at 804." *McGinnis*, 290 Kan. at 552-53.

Thomas argues that a reasonable person would not have felt free to leave under the totality of the circumstances facing her during the second stage of her encounter with Officer Brown. Thomas first points out that upon returning to Officer Brown's presence, she was immediately questioned about drugs and drug paraphernalia, including whether she had recently used or was currently possessing drugs. His repeated questions persisted even after Thomas' repeated denials.

Additionally, Thomas emphasizes Officer Brown's call for officer back-up, arguing that it further conveyed to a reasonable person that he or she was not free to leave. As noted, Brown used his shoulder radio to ask, "Can you come up here to North 1300 Webster?" He admitted on the stand, and the videotape of the incident confirms, that he called for the back-up officer in Thomas' presence before she admitted possessing two crack pipes. He also admitted that Thomas more than likely heard him call for this back-up. And Thomas correctly points out that in the district court judge's voluntariness analysis, he failed to address Brown's call for back-up as a factor.

In support of Thomas' argument that the call for back-up is a factor relevant to our determination, she cites *Falls v. State*, 953 So. 2d 627 (Fla. Dist. App. 2007), and *Morrow v. State*, 848 So. 2d 1290 (Fla. Dist. App. 2003). We find *Morrow* of particular guidance. There, an officer stopped a car for speeding and for failing to display a tag. The officer obtained the driver's identification and

requested the same from the passenger—who was not wearing a seatbelt. The passenger refused to provide identification, and the officer walked around the car, positioned himself "right outside the passenger door," and called for back-up. 848 So. 2d at 1292. When the back-up officer arrived, the passenger provided his name, and a warrants check revealed outstanding warrants for his arrest. A search incident to arrest produced crack cocaine and marijuana.

The *Morrow* court determined that "what began as a consensual encounter evolved into an investigatory stop." 848 So. 2d at 1293. The officer's position outside the passenger door prevented the passenger from leaving, and when combined with the officer's call for back-up, the court determined that a reasonable person would not feel free to leave. 848 So. 2d at 1292-93.

The Court of Appeals panel in the instant case correctly noted that no Kansas appellate court has addressed how a call for back-up factors into the detention analysis. The panel did not address *Falls* or *Morrow*. Rather, it cited *State v. Green*, 375 Md. 595, 826 A.2d 486 (2003), for the apparent proposition that an officer's call for back-up does not automatically result in an investigatory deten-tion—*i.e.*, it does not automatically signal to a reasonable person that he or she is not free to leave.

In *Green*, a deputy stopped the defendant's car for speeding. Dispatch revealed that the defendant's license was valid, but that he had "prior caution codes for armed and dangerous and . . . drugs." 375 Md. at 601. The deputy issued a warning citation and returned the defendant's documents. The officer told the defend-ant he was "free to go" but then asked if the defendant would answer more questions. 375 Md. at 601. The defendant agreed to answer further questions and also consented to a search of his vehicle. To ensure his safety, the deputy asked the defendant to exit the vehicle and then called for back-up to assist with the search. While waiting for the back-up officers, the deputy explained to the defendant his purpose in calling for back-up was to ensure the deputy's safety.

The *Green* court rejected a lower court statement that " 'calling for back-up would generally signal to a reasonable person that the continuation of the encounter is not really a matter of choice.' "

375 Md. at 617. Rather, the court opined that since the officer explained that he called for back-up as a safety measure, it "did not suddenly transform the consensual encounter into a seizure." 375 Md. at 617.

*Green* is readily distinguishable from this case. Unlike the deputy in *Green*, Officer Brown did not explain to Thomas the purpose of his call for back-up. Nor did he already have consent to search or reason to conduct a pat-down when he made the call. Thomas had not admitted to possessing the two crack pipes when the back-up call was made, but instead had consistently denied drug use and possession. Nevertheless, we agree with the panel that a mere call for back-up does not automatically transform all citizen-law enforcement encounters into investigatory detentions. Rather, the call is a factor to be considered in the totality of the circumstances of each case.

A call for back-up has some parallels to a more common factor: the actual presence of more than one officer at the scene. See *McGinnis*, 290 Kan. at 553. We acknowledge that in some situations, the presence of more than one officer is not indicative of a coercive atmosphere. See, *e.g.*, *State v. Lee*, 283 Kan. 771, 156 P.3d 1284 (2007) (two officers approached defendant in park and encounter was voluntary in light of surrounding events). However, a person seeing and hearing a single law enforcement officer asking for another officer to "come up here to North 1300 Webster" (their exact location) would strongly suggest to a reasonable person that the called officer was being asked to "back up" the calling officer in ways besides just helping to ask more questions—which the person is free to ignore. See *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). This element is not present with the simultaneous appearance of two officers. See *Lee*, 283 Kan. 771.

We conclude that Officer Brown's call for back-up, when combined with his other conduct, would convey to a reasonable person that he or she was not free to refuse to answer Brown's questions or otherwise terminate the second stage of the encounter. See *State v. McGinnis*, 290 Kan. at 552. More specifically, both before and after making the call, Brown repeatedly asked Thomas questions

about her drug use and possession. After the call, Thomas emptied her pockets for him, apparently in an attempt to prove her denials. He then asked to feel inside her pockets, and she threw her hands in the air. After Brown again told Thomas to "be honest with me," she confessed to possessing two crack pipes. In contrast to the first stage, at no time during the second stage did Brown tell Thomas she was free to leave. See *State v. Thompson*, 284 Kan. 763, 811, 166 P.3d 1015 (2007) (a clear communication that the person is free to terminate the encounter or refuse to answer questions is a factor in determining the coercive effect of the encounter); *State v. Reason*, 263 Kan. 405, 414, 951 P.2d 538 (1997).

*Reasonable suspicion*

Having established that the second stage of the encounter turned into an investigatory detention, our next question is whether this detention was statutorily and constitutionally permissible. See *State v. Pollman*, 286 Kan. 881, 889, 190 P.3d 234 (2008). Investigatory detentions are generally permitted under the Fourth Amendment to the United States Constitution and K.S.A. 22-2402 if "an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime." *Pollman*, 286 Kan. at 889 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968], and *Thompson*, 284 Kan. at 773).

We recently discussed additional considerations for how "reasonable suspicion" is evaluated in *State v. Moore*, 283 Kan. 344, 354, 154 P.3d 1 (2007), where we stated:

" ' "What is reasonable is based on the totality of the circumstances and is viewed in terms as understood by those versed in the field of law enforcement." [quoting *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993)] . . . .

"[W]e judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] 'Our task . . . is not to pigeonhole each purported fact as either consistent with innocen[ce] . . . or manifestly suspicious,' [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a 'minimum level of objective justification' which is 'considerably less

than proof of wrongdoing by a preponderance of the evidence.' " ' 263 Kan. at 734-35 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 [10th Cir. 1997]; citing *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 [1989])."

Similarly, the United States Supreme Court has stated:

" 'While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification. . . . [Citation omitted.] The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch' " of criminal activity. [Citation omitted.]' *Illinois v. Wardlow*, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000)." *Moore*, 283 Kan. at 354-55.

Whether reasonable suspicion exists is a question of law. We use a mixed question standard of review, determining whether substantial competent evidence supports the district court's findings, while the legal conclusion is reviewed de novo. *Moore*, 283 Kan. at 350 (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 [1996]). Because the district court judge found the encounter voluntary, he did not discuss whether Officer Brown possessed reasonable suspicion to detain Thomas.

Thomas contends that the detention was unsupported by reasonable suspicion because Officer Brown never had any reason to believe she had committed or was committing a crime. Although the Court of Appeals panel determined the encounter was voluntary, it also found that Brown had reasonable suspicion to extend the encounter based on two factors: Thomas' admission that she came from the house of a known drug dealer (Frank) and Brown's prior involvement with Thomas when her upset and intoxicated husband called 911 claiming she left their house with a drug dealer. *Thomas*, 2008 WL 4222877, at *3 (Kan. App. 2008). The State agrees with the panel.

We disagree with the panel and the State. While Thomas was headed home after admittedly leaving an area known for drugs, and while Brown watched part of her journey, Brown did not hear or see anything that would create reasonable suspicion of her criminal activity, *e.g.*, that she was under the influence of drugs. He admitted he had no evidence to suggest such influence or that she

possessed illegal drugs or paraphernalia. Indeed, Thomas continually denied Brown's allegations of illegal activity suggested in his questions.

We conclude that Officer Brown was unable to articulate more than an inchoate and unparticularized suspicion or hunch that Thomas was involved in criminal activity. See *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). A contrary holding could permit officers to detain persons leaving known drug areas without any further indicia of illegal activity. The United States Supreme Court expressly rejected this approach in *Brown v. Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), holding, "The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct." Brown's recollection of an episode of an unknown date where Thomas' angry and intoxicated husband accused her of leaving their house with a drug dealer is likewise insufficient to help rise to the level of reasonable suspicion on the present occasion.

Because we hold that the investigatory detention was unsupported by reasonable suspicion and Thomas therefore was illegally detained, we reverse the decisions of the Court of Appeals and the district court. As a consequence of the illegal detention, the evidence then obtained should have been suppressed as "fruit of the poisonous tree." See *Wong Sun v. United States*, 371 U.S. 471, 484-87, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Epperson*, 237 Kan. 707, 718-19, 703 P.2d 761 (1985).

*Issue 2: Thomas was not denied her statutory right to a speedy trial.*

Thomas next claims she was denied her statutory right to a speedy trial. In her pretrial motion to dismiss on speedy trial grounds, she claimed her time started running on the day of her arraignment: February 10. Her calculations attributed 184 days to the State, which exceeds the 180-day limit in K.S.A. 22-3402(2). The State's response calculated a maximum of 102 days that were attributable to it. The district court attributed 179 days to the State and consequently denied Thomas' motion to dismiss.

On appeal, Thomas attributes 10 more days to the State, for a total of 194 days. This new total represents two changes to her district court calculation. First, she subtracted 5 days assessed against the State due to her miscalculation on the March 24 continuance requested by both parties. Second, she assessed against the State 15 days—from January 26 (the day she waived preliminary hearing) through February 10 (the day of her arraignment). In short, she claims that the speedy trial clock started not upon the day of her actual arraignment, but upon the day she argues she should have been arraigned: when she waived her right to a preliminary hearing. She cites K.S.A. 22-3206(3) in support. She argues that her speedy trial right was violated because the trial was more than 180 days from the day "she should have been arraigned."

The State responds that the 15 days between Thomas' waiver of a preliminary hearing and her arraignment are not assessed against either party because the speedy trial clock starts at arraignment, *i.e.*, February 10.

As a threshold matter, the State argues Thomas did not preserve this issue for appeal. First, it contends she advances a different argument on appeal than she presented to the district court. Second, she failed to previously object to the setting of her arraignment on a different day than the one when she waived her preliminary hearing.

We turn to the State's first contention: that Thomas presents an argument that was not presented to the district court.

The cases of *R.D. Andersen Constr. Co. v. Kansas Dept. of Human Resources*, 7 Kan. App. 2d 453, 643 P.2d 1142 (1982); *State v. Murray*, 22 Kan. App. 2d 340, 916 P.2d 712 (1996), and *State v. LaBelle*, 290 Kan. 529, 231 P.3d 1065 (2010), are of guidance. In *R.D. Andersen*, the trial court directed both parties to brief an issue. However, the appellant failed to comply with the order and instead repeated its earlier statements to the court. The trial court decided the issue adversely to the appellant. On appeal, the appellee argued that the Court of Appeals was precluded from reviewing the issue since the appellant failed to brief and argue the issue to the trial court. The Court of Appeals disagreed. Despite appellant's "curious decision" to not brief the issue, it held the issue

was presented to the trial court and was therefore considered on appeal. *R.D. Andersen,* 7 Kan. App. 2d at 456.

In *Murray,* the defendant pleaded guilty to two separate offenses in one hearing. He later sought to withdraw his plea when, to his surprise, the trial court included expunged juvenile adjudications in his criminal history score. The trial court refused to grant the withdrawal, and the defendant appealed. The Court of Appeals noted that the issue at the trial court was whether expunged juvenile adjudications could be included in a criminal history score, but on appeal, the defendant asserted a broader claim: whether *any* juvenile adjudications could be included in a criminal history score. Despite the apparent change in argument, the panel considered the claim "[b]ecause the trial court addressed the latter more specific issue concerning expunged juvenile adjudications." 22 Kan. App. 2d at 343 (citing *R.D. Andersen,* 7 Kan. App. 2d at 456).

We recently reviewed an analogous situation in *LaBelle.* The trial court classified LaBelle as a persistent sex offender without specifying which of two prior qualifying offenses was used to make the determination. LaBelle challenged his status as a persistent sex offender, and at both the trial court and the Court of Appeals he focused his arguments on one of the prior qualifying offenses. To this court, LaBelle filed a supplemental brief that addressed the other qualifying offense. We rejected the State's argument that LaBelle was precluded from arguing against one of the prior offenses because he did not raise it until after the panel issued its opinion. Because LaBelle's underlying claim remained the same, and because the panel addressed the argument, we considered LaBelle's arguments regarding the prior offense that he did not make to any court below.

Similar to those cases, here the trial court addressed Thomas' general speedy trial claim. Likewise, on appeal Thomas has, at all times, maintained that her statutory right to a speedy trial was denied, *i.e.,* the trial occurred after more than 180 days assessed against the State. We acknowledge she has changed her calculation of the total number of days on appeal due to a new statutory interpretation, as discussed later in the opinion. While a close call, we will review Thomas' speedy trial arguments.

The State's second threshold argument is that Thomas failed to comply with K.S.A. 60-404 by contemporaneously objecting to the setting of her arraignment on a different date than the one when she waived her preliminary hearing. We must reject her argument because this statute clearly is limited to evidentiary matters. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (K.S.A. 60-404 "dictates that *evidentiary* errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial.").

Turning to the merits of Thomas' speedy trial claim, we begin our analysis by reciting our standard of review: "The question of whether there was a violation of the statutory right to a speedy trial is a matter of law, and we review it using a de novo standard of review. [Citation omitted.]" *State v. Mitchell*, 285 Kan. 1070, 1080, 179 P.3d 294 (2008) (relying on *State v. Adams*, 283 Kan. 365, 368, 153 P.3d 512 [2007]); accord *State v. Vaughn*, 288 Kan. 140, 143, 200 P.3d 446 (2009).

The Court of Appeals determined that the lack of facts in the record regarding the reason for the 15-day delay between her waiver of a preliminary hearing and her arraignment precluded appellate review of the changed calculation advanced on appeal. Nevertheless, the panel determined that, based on the record and Thomas' original calculation, the State brought her to trial 179 days after her arraignment, within the statutorily mandated 180 days.

Two statutes are at play in the instant case: K.S.A. 22-3402(2) and K.S.A. 22-3206(3). The former provides:

"If any person charged with a crime and held to answer on an appearance bond shall not be brought to trial *within 180 days after arraignment on the charge*, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5)." (Emphasis added.)

The speedy trial clock begins at arraignment. See *Vaughn*, 288 Kan. at 143-44 (statutory right to speedy trial started at arraignment); *State v. Brown*, 283 Kan. 658, 157 P.3d 624 (2007) (same).

Thomas acknowledges this statute provides that the statutory speedy trial clock starts at arraignment. However, she relies upon

K.S.A. 22-3206(3), which considers when a preliminary examination has been waived:

"If the preliminary examination is waived, *arraignment shall be conducted at the time originally scheduled for the preliminary examination* if a judge of the district court is available, subject to the assignment pursuant to K.S.A. 20-329 and amendments thereto to conduct the arraignment." (Emphasis added.)

Thomas contends that the speedy trial clock should start on the day she waived her preliminary examination because, subject to some exceptions she claims are not present here, 22-3206(3) requires arraignment on the same day as the waiver.

We disagree. Thomas' argument is that her right to a speedy trial was violated. K.S.A. 22-3402 is well known as the speedy trial statute; it is the statute applicable to her speedy trial claim. See *Vaughn*, 288 Kan. at 143-44. And its plain language clearly requires trial 180 days "after arraignment." See *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 460, 124 P.3d 57 (2005) ("Intent of the legislature is to be derived in the first place from the words used."); see also *Vaughn*, 288 Kan. at 144 ("the calculation of time for a speedy trial begins on the date of arraignment"). Thomas' actual arraignment was not on January 26 but on February 10.

We acknowledge the language of K.S.A. 22-3206(3) and its apparent basis for Thomas' argument. However, this statute generally concerns the timing of arraignments, *e.g.*, possible "late arraignments." It does not concern lack of speedy trial. It therefore does not control the plain language of the speedy trial statute, which is the specific basis for Thomas' claim. *Cf. In re K.M.H.*, 285 Kan. 53, 82, 169 P.3d 1025 (2007), *cert. denied* 555 U.S. at 937 (2008) (a specific statute controls over a general statute). Per K.S.A. 22-3402, the date of the actual arraignment is the trigger for starting the speedy trial clock. This is despite Thomas' argument to the contrary, *e.g.*, that she was "illegally arraigned 15 days after her waiver" and these days should be attributable to the State.

Given our conclusion, we need not resolve the parties' dispute on whether the judge who accepted Thomas' waiver was a magistrate judge; whether under K.S.A. 20-302b(a) magistrate judges in the 8th judicial district may actually hear "felony arraignments sub-

ject to assignment pursuant to K.S.A. 20-329 and amendments thereto"; and whether, as found by the panel, "Thomas did not prove then and does not prove on appeal that a district court judge was available to hear her arraignment" under K.S.A. 22-3206(3). *Thomas*, 2008 WL 4222877, at *4.

Our review reveals that Thomas was brought to trial within 180 days of her arraignment:

At the February 10 arraignment, Judge Hornbaker set the case for jury trial on March 29, with a status hearing on March 24. Both parties agree that the 42 days between February 10 and March 24 are assessed against the State. See *Vaughn*, 288 Kan. at 147 (days between arraignment and next event were assessed against the State).

At the March 24 status hearing, both parties requested and received a continuance until April 14. Thomas is assessed the time between March 24 and April 14 because she acquiesced in the continuance. See *Brown*, 283 Kan. at 662 ("A defendant, by requesting or acquiescing in the grant of a continuance, waives the statutory right to a speedy trial.").

On April 14, 2006, Thomas filed a motion for a competency evaluation, and Judge Hornbaker issued an order granting the evaluation the same day. Therefore, Thomas is assessed the time between April 14 and June 2 because "the reasonable delays attributed to the psychiatric evaluation of the defendant by both parties are charged to the defendant for purposes of the speedy trial statute." *State v. McGee*, 280 Kan. 890, 893, 126 P.3d 1110 (2006). The State's brief uses April 16 instead of April 14 in its computation; however, the date Thomas filed the motion for a competency evaluation stops the clock against the State. See *McGee*, 280 Kan. at 891-93; *State v. Powell*, 215 Kan. 624, 625, 527 P.2d 1063 (1974).

At the June 2 competency hearing, the district court found Thomas competent to stand trial. According to the journal entry, Thomas also pleaded not guilty, and the court set the case for trial on August 23, with a status hearing on August 18. The State calculates this time against Thomas, claiming she changed her mind about the plea and caused the delay. We disagree. Thomas waived her right to a jury trial on October 17, which is outside the June 2-

August 18 time frame. Once a defendant is found competent to stand trial following a competency evaluation, time starts running against the State unless otherwise chargeable against the defendant. See *State v. Prewett*, 246 Kan. 39, 42-43, 785 P.2d 956 (1990); *Powell*, 215 Kan. at 625. Thus, the State is assessed 77 days from June 2 and August 18.

At the August 18 status hearing, the court continued the matter for jury trial until October 18. A transcript of the August 18 hearing was not included in the record, but both parties contend that the court continued the matter due to insufficient court staff to empanel a jury. "The burden of bringing an accused to trial within the allowed time is on the State. A defendant is not required to take any affirmative action to see that his right is observed." *State v. Dreher*, 239 Kan. 259, 260, 717 P.2d 1053 (1986). For example, in *Vaughn* the district court judge became ill, and absent an acquiescence by the defendant, the State was assessed the delay. 288 Kan. at 146-47. Because there is no record of the event, we cannot determine if Thomas demonstrated more than mere passive acceptance and agreed to the delay. See *Vaughn*, 288 Kan. 140, Syl. ¶ 4. Therefore, the State is assessed 60 days from August 18 to October 17.

Finally, Thomas is assessed the time between October 17 and her November 8 bench trial. On October 17, Thomas requested the matter be taken out of the jury trial setting and set for a bench trial. Thomas acknowledges that she is responsible for this delay. "[D]elays that result from the request of a defendant toll the statutory speedy trial period. [Citations omitted.]" *Vaughn*, 288 Kan. at 144.

In total, the State is assessed 179 days, which is within the permitted period between arraignment and trial in K.S.A. 22-3402(2). Therefore, Thomas was not denied her right to a speedy trial.

Issue 3: *Thomas did not preserve for appeal whether the admitted KBI report violated her Sixth Amendment rights.*

Finally, Thomas claims the district court violated her Sixth Amendment right to confrontation by admitting a KBI forensic lab report without requiring the forensic examiner to testify.

The State responds that Thomas failed to preserve this issue for appeal with a contemporaneous trial objection on this specific ground. While Thomas concedes that she earlier objected on Fourth Amendment grounds, not Sixth, she nevertheless contends that this court may review her new argument under *State v. Puckett*, 230 Kan. 596, 940 P.2d 1198 (1982). More particularly, she contends our review is necessary to prevent the denial of her fundamental right of confrontation. We agree with the State.

The holding in *State v. McCaslin*, 291 Kan. 697, 245 P.3d 1030 (2011), controls. At trial, McCaslin objected to a prosecutor's question as "stating facts not in evidence." On appeal, we denied McCaslin's challenge of the same statement on Confrontation Clause grounds because his objection, while timely, was not specific to confrontation. We held that the trial court never had a chance to rule on the ground argued on appeal, and the contemporaneous objection rule barred our review. Accord *State v. Bryant*, 272 Kan. 1204, 38 P.2d 661 (2002).

Judgment of the Court of Appeals is reversed. Judgment of the District Court is reversed. Case remanded.