NOT DESIGNATED FOR PUBLICATION

No. 120,898

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

ULYSSES WILLIAMS JR.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed November 1, 2019. Reversed and remanded.

*Natasha Esau*, assistant district attorney, *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Shannon S. Crane*, of Hutchinson, for appellee.

Before POWELL, P.J., HILL and WARNER, JJ.

PER CURIAM:  In this interlocutory appeal, the State argues the district court improperly granted Ulysses Williams' motion to suppress evidence following an investigatory stop in Hutchinson. The State contends its initial investigation was supported by reasonable and articulable suspicion and that, even if the officers' subsequent detention of Williams were unlawful, the discovery of a valid warrant only a few minutes later attenuated the taint of any unlawful seizure. We agree. Thus, we reverse and remand the case to the district court.

1

Shortly before 7 a.m. on August 22, 2018, a concerned neighbor called the City of Hutchinson Police Department and reported that she believed a man was trying to break into a garage across the street. The neighbor had observed the man walking around the garage and hiding when cars drove by; she thought his behavior was suspicious. She reported that he was a black male in a long-sleeved shirt and a hat, carrying a bag.

Officer Raven Boettger responded to investigate the potential theft or burglary. Upon her arrival, Officer Boettger introduced herself to a man who matched the neighbor's description. The man later identified himself as Ulysses Williams Jr.

The entire interaction between Williams and Officer Boettger was recorded via the officer's body camera. Williams had been talking to someone on the front stoop of a house and walked toward Officer Boettger as she got out of her squad car. As she approached, Williams told her, "I'm alright. . . . The lady probably called."

Williams informed Officer Boettger that he was storing his belongings in the back of the house and that he had the homeowner's permission to do so. Williams explained he was using the garage to store his things because he had been kicked out of his residence. Officer Boettger asked Williams for the name of the homeowner, and Williams indicated her name was "Logan."

Officer Boettger asked Williams if he had any identification on him, and Williams responded that his identification was inside the house. At her request, however, Williams provided his full name and date of birth.

Two more police officers arrived at the scene, and Officer Boettger asked Williams to stay with them as she went to check with the homeowner to make sure

everything was "on the up and up." Officer Boettger walked to the door of the house, radioing dispatch to provide Williams' name and date of birth. The officer then knocked on the door, spoke with the homeowner, confirmed the woman was Logan, and confirmed that Williams had Logan's permission to use the garage.

After verifying Williams' story, Officer Boettger walked back to where Williams was standing and talking with one of the other officers. The officers asked Williams about his living situation and employment status. Williams never asked if he could leave, nor did the officers inform him that their investigation had concluded. About 2½ minutes after Officer Boettger had spoken with Logan—and about 5 minutes after she originally arrived at the scene—dispatch advised Officer Boettger of an outstanding warrant for Williams for a probation violation.

Officer Boettger informed Williams of the warrant. Williams became frustrated and asked if he could give some of his belongings to Logan before he was arrested. The officers placed Williams in handcuffs but allowed him to walk towards the house to give some of his things to the homeowner. As he was attempting to do so, a clear plastic container fell to the ground. The officers retrieved the container, which held methamphetamine crystals. The officers then searched Williams, finding a glass pipe and a set of brass knuckles.

The State charged Williams with possession of methamphetamine, possession of drug paraphernalia, and criminal possession of a weapon. He moved to suppress all the evidence seized, arguing Officer Boettger lacked reasonable suspicion to conduct her investigation and that the later discovery of the warrant did not attenuate the taint of her unconstitutional conduct. The district court granted Williams' motion and suppressed the evidence, explaining:

"The stop of defendant does not qualify as an allowed Terry stop. Defendant did nothing to suggest he might be involved in criminal activity. The officer's inquiry went beyond any reasonable amount of time, even assuming a Terry stop was authorized. There was no evidence presented to support a finding that the warrant search was not the purpose of the seizure. The discovery of the warrant was not an intervening circumstance."

The case is now before this court on the State's interlocutory appeal from the district court's suppression order.

## DISCUSSION

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights also guarantees that citizens shall be free from unreasonable searches and seizures and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010).

Whenever an officer encounters a citizen in a public place, the rights protected by the Fourth Amendment are implicated. The rules of law applied to safeguard the Fourth Amendment's protections vary depending on the type of encounter between the individual and law enforcement. Kansas courts have recognized four types of such encounters: (1) voluntary encounters; (2) investigatory detentions; (3) public safety stops; and (4) arrests. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

An investigatory detention—also known as a "*Terry* stop" after *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)—occurs when an officer detains a person in a public place because the officer reasonably suspects the person "is committing, has

committed or is about to commit a crime." K.S.A. 22-2402(1); see *Terry*, 392 U.S. at 21-22. Stated slightly differently, an officer may generally detain an individual if "an objective officer would have [had] a reasonable and articulable suspicion." *State v. Thomas*, 291 Kan. 676, Syl. ¶ 8, 246 P.3d 678 (2011). A reasonable suspicion is "a particularized and objective basis for suspecting the person stopped is involved in criminal activity." 291 Kan. 676, Syl. ¶ 9. Reasonableness in this context is viewed "'based on the totality of the circumstances'" and "'in terms as understood by those versed in the field of law enforcement.'" 291 Kan. at 687 (quoting *State v. Moore*, 283 Kan. 344, 354, 154 P.3d 1 [2007]).

Whether reasonable suspicion exists is a question of law. *Thomas*, 291 Kan. at 688. Reasonable suspicion is a less rigorous standard than probable cause and requires a showing considerably less than preponderance of the evidence. *State v. Johnson*, 293 Kan. 1, 6, 259 P.3d 719 (2011). But the standard requires more than an inchoate and unparticularized suspicion or hunch of criminal activity. 293 Kan. at 6 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 [2000]).

The exclusionary rule is the primary judicial remedy used to deter Fourth Amendment violations and requires courts "to exclude unlawfully seized evidence in . . . criminal trial[s]." *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). It applies to "'primary evidence obtained as a direct result of an illegal search or seizure'" and to "'evidence later discovered and found to be derivative of an illegality.'" 136 S. Ct. at 2061 (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 [1984]). But at its core, the exclusionary rule is a judicially created remedy that only applies when "'its deterrence benefits outweigh its substantial social costs.'" *Strieff*, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 [2006]). In other words, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable

5

that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

The district court here found the exclusionary rule applied, and thus excluded the evidence seized during the course of Williams' arrest and search. In particular, the court found that the officers' investigation and detention of Williams did "not qualify as an allowed *Terry* stop" because Williams "did nothing to suggest he might be involved in criminal activity." The court also found that even if a *Terry* stop had been authorized at some point, Officer Boettger's investigation "went beyond any reasonable amount of time." Finally, the court concluded that the discovery of a warrant for Williams "was not an intervening circumstance" that saved the evidence from the conduct the court found to be illegal.

The State challenges this ruling in two related claims on appeal. First, the State argues the district court should not have suppressed the evidence below because—contrary to the district court's conclusion—Officer Boettger had a reasonable and articulable suspicion that allowed her to detain and investigate Williams. Second, the State asserts that even if the officers' detention of Williams was unlawful, the discovery of the arrest warrant attenuated the illegal conduct from the subsequent search under *Strieff*.

Appellate courts employ a two-step review to evaluate a district court's decision on a motion to suppress. A reviewing court first determines whether the district court's factual findings are supported by substantial competent evidence. Accord *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009) (defining substantial competent evidence as "that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved"). The court then reviews de novo the ultimate legal conclusion regarding the legality of law enforcement's conduct. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). When the material facts underlying the

6

decision on a motion to suppress are not in dispute, a district court's grant or denial of that motion is a question of law subject to unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

1. *The officers had reasonable suspicion to investigate a possible theft or burglary based on the neighbor's concerns.*

The State first contends that Officer Boettger had a reasonable and articulable suspicion that Williams was engaged in criminal behavior—such as theft, burglary, or trespassing—and that the officers were properly performing an investigation based on the information provided by dispatch. The State argues that the district court's ruling amounted to a conclusion that the officers were required to ignore the information they had received from dispatch as soon as Williams informed Officer Boettger he had permission to be on the property. But that is not the law. Instead, the State correctly points out that law enforcement may conduct an investigation when there is reasonable suspicion of criminal activity.

Williams argues the district court correctly found that Officer Boettger did not have reasonable suspicion of criminal activity and that, even assuming a *Terry* stop had been authorized, the inquiry went beyond the length of time that was reasonable under the circumstances in this case.

The evidence presented at the hearing on the motion to suppress consisted of Officer Boettger's body camera footage, the call detail report created by Hutchinson Police Department's dispatch, and the testimony of Officer Boettger. This evidence is not in dispute, rendering the existence of reasonable suspicion a question of law subject to unlimited review. See *Hanke*, 307 Kan. at 827.

7

Whether reasonable suspicion exists is "'dependent upon both the content of the information possessed by police and its degree of reliability.'" *State v. Slater*, 267 Kan. 694, 697, 986 P.2d 1038 (1999) (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 [1990]). Our Kansas Supreme Court has recognized that a tip given to law enforcement—that is, "[i]nformation received by police from an outside source"—standing alone may "provide reasonable suspicion for an investigatory stop." *Slater*, 267 Kan. 694, Syl. ¶ 3. The reliability of such a tip depends on its source and on "the quantity and quality of the information received." 267 Kan. 694, Syl. ¶ 3. In general, the most favored (and most reliable) tips are those where "the person giving the tip gives the police his or her name and address or identifies himself or herself in such a way" that the person "can be held accountable" for the accuracy of the information provided. 267 Kan. at 700.

When Officer Boettger arrived at the scene, she was investigating a possible burglary based on information that had been provided by a neighbor. This information—that a man carrying a bag was acting suspiciously, hiding from cars, and lurking around a nearby garage—gave rise to reasonable suspicion of criminal activity. When the officer received this information, she was then able to investigate its accuracy, including detaining Williams until that investigation had concluded. And Officer Boettger also acted within the permissible zone of police conduct when she provided Williams' name to dispatch while she was conducting her investigation. See *State v. Walker*, 292 Kan. 1, 14-16, 251 P.3d 618 (2011). The fact that Williams was not acting suspiciously when she arrived and cooperated with the officers at the scene does not prevent law enforcement from investigating the tip they had received.

Under the totality of the circumstances, we conclude the district court erred in finding the officers lacked reasonable suspicion to conduct an investigation and detain Williams until that investigation concluded.

8

2. *Even if Williams' detention exceeded the scope of the investigation, Williams' arrest—and the accompanying search—were permissible because the discovery of an arrest warrant for Williams sufficiently attenuated the search from any unlawful conduct.*

Williams also argues that even if his original detention was a valid *Terry* stop, the officers exceeded the scope of the stop when they continued to surround and talk to him after Officer Boettger had confirmed with Logan that Williams had her permission to store things in her garage. At that point, Williams asserts, the detention became unlawful, and the subsequently seized evidence should still be excluded. Accord *State v. Smith*, 286 Kan. 402, 410, 184 P.3d 890 (2008) ("'[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'") (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 [1983]). The State argues that even if Williams was unlawfully detained, the discovery of an unconnected and preexisting warrant attenuates the stop from the search and subsequent discovery of the evidence. See *Strieff*, 136 S. Ct. at 2061.

As a preliminary matter, we are not convinced the officers continued to detain Williams after their investigation ended. Officer Boettger testified that Williams was seized and not free to leave *until his story was confirmed with the homeowner*. The body camera footage shows Williams speaking with two officers, including Officer Boettger, for roughly 2½ minutes after the conclusion of the investigation before dispatch contacted the officers with information regarding Williams' warrant. The officers did not specifically inform Williams he could leave, and he did not ask if their investigation was finished. Williams was merely standing in Logan's yard; he was not constrained in any fashion. It is unclear—and the district court made no finding—regarding whether someone in Williams' position may have believed he was free to go.

Such a finding is unnecessary, however, because the attenuation doctrine—an exception to the exclusionary rule—applies in this case. That is, even if the officers'

continued conversation with Williams after the investigation was an impermissible stop, the information regarding Williams' warrant attenuated his subsequent arrest from any unlawful detention.

Although courts generally exclude evidence found as a result of an unlawful stop or seizure, the United States Supreme Court has indicated that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff*, 136 S. Ct. at 2061. In such cases, "'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" 136 S. Ct. at 2061 (quoting *Hudson*, 547 U.S. at 593). Stated slightly differently, Kansas courts have found that the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated. *State v. Williams*, 297 Kan. 370, 381, 300 P.3d 1072 (2013).

There is no bright-line rule defining when the attenuation doctrine applies. Instead, in determining whether the discovery of evidence is sufficiently attenuated from unlawful police conduct, courts consider three factors: (1) the temporal proximity between the unlawful conduct and the discovery of the evidence in question; (2) the presence of intervening circumstances (such as the discovery of a warrant); and (3) the purposes and flagrancy of the official misconduct. *Strieff*, 136 S. Ct. at 2061-62; *State v. Manwarren*, 56 Kan. App. 2d 939, 952, 440 P.3d 606, *rev. denied* 310 Kan. ___ (September 11, 2019). No one factor is controlling, and other considerations may be relevant to the attenuation doctrine analysis. See *Brown v. Illinois*, 422 U.S. 590, 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (declining to adopt any "talismanic test" and cautioning that the attenuation doctrine depends on the circumstances of each case). The State bears the burden of demonstrating the evidence is sufficiently removed from the illegal activity to permit its admissibility. *Cleverly*, 305 Kan. at 611.

In *Strieff*, the Court examined "whether th[e] attenuation doctrine applies when an officer makes an unconstitutional investigatory stop; learns during that stop that the suspect is subject to a valid arrest warrant; and proceeds to arrest the suspect and seize incriminating evidence during a search incident to that arrest." 136 S. Ct. at 2059. The Court held that even though the illegal stop in that case was "close in time to Strieff's arrest," the unlawful conduct in performing the stop "was sufficiently attenuated by the pre-existing arrest warrant." 136 S. Ct. at 2063. The Court found that the "outstanding arrest warrant for Strieff's arrest [was] a critical intervening circumstance that [was] wholly independent of the illegal stop." 136 S. Ct. at 2063. Thus, the "discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling [the officer] to arrest Strieff." 136 S. Ct. at 2063.

*Strieff* directs the outcome in this case. See *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 1, 297 P.3d 1164 (2013) ("The United States Supreme Court's interpretation of the United States Constitution is controlling upon and must be followed by state courts."); see also *Daniel*, 291 Kan. at 498 (Kansas Constitution provides the "the same protection from unlawful government searches and seizures as the Fourth Amendment"). Although Williams' arrest and the officers' subsequent discovery of the evidence at issue in this case occurred only minutes after any potentially unlawful detention, the discovery of the warrant gave rise to an independent obligation to arrest him. See *Strieff*, 136 S. Ct. at 2062. That is, the warrant is an intervening circumstance that sufficiently attenuates the connection between any potentially unlawful conduct and the discovery of the evidence in question. 136 S. Ct. at 2061-62.

Further, having observed the footage from Officer Boettger's body camera, we do not find any conduct by the officers to be flagrant. It is constitutionally permissible for a law enforcement officer to obtain an individual's personal information and check for outstanding warrants when the officer has reasonable suspicion to detain and investigate the person for criminal activity. See *Walker*, 292 Kan. at 14-16. The officers were

11

conducting a permissible investigation and checked for warrants during the context of that investigation. We note that even if one of the officers had specifically informed Williams he was free to leave once Officer Boettger had spoken with the homeowner, the officers would have received the information regarding Williams' arrest warrant roughly two minutes later.

Under the facts of this case, even if the officers unlawfully prolonged Williams' detention, the discovery of his warrant sufficiently attenuated any connection between that conduct and the subsequent discovery of evidence of criminal activity. Thus, the district court erred in applying the exclusionary rule here. We therefore reverse the district court's suppression ruling and remand the case for further proceedings in light of the admissibility of the discovered evidence.

Reversed and remanded.